**Willie M. ZANDERS et al.**

v.

**LOUISIANA STATE BOARD OF EDUCATION and Ralph Waldo Emerson Jones, in his capacity as President of Grambling College of Louisiana.**

Civ. A. No. 13427.

United States District Court
W. D. Louisiana,
Monroe Division.

March 8, 1968.

Richard B. Sobol, Donald Juneau, and Robert P. Roberts, New Orleans, La., Paul H. Kidd, Ruston, La., Collins, Douglas & Elie, New Orleans, La., for plaintiffs.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Thomas W. McFerrin, Asst. Atty. Gen., Baton Rouge, La., Robert U. Goodman, Asst. Atty. Gen., Shreveport, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

### RULING

Unlike the great majority of civil rights controversies, this one, oddly enough, basically and exclusively involves a clash among members of the Negro race.

Except that the members of the Louisiana State Board of Education, all white, who reviewed the case in a full trial *de novo*, there were no racial overtones presented. From all that appears in the Record, the Board "leaned over backward" in hearing and deciding the case. As hereinafter noted, plaintiffs' counsel, an experienced expert in the field involved, conceded that the Board, having ultimate authority in the premises, acted entirely upon a fair and impartial basis.

Plaintiffs, twenty-six of some twenty-nine students who were expelled from Grambling College, a Negro educational institution of higher learning, established by the Louisiana Legislature in 1928 (See LSA–R.S. 17:10, Reporter's Notes, p. 165), located in North Louisiana, brought this action pursuant to 42 U.S.C. § 1983

and 28 U.S.C. § 2201.[1] They sought declaratory and injunctive relief to redress alleged violations of their rights secured by the First and Fourteenth Amendments to the United States Constitution.

In addition to a prayer for declaration of their rights, plaintiffs sought a temporary restraining order, as well as a preliminary and permanent injunction, reinstating them in good standing with Grambling College.

Our jurisdiction is based upon 28 U.S.C. §§ 1331(a), 1343(3).[2] For a full understanding and specific clarification, the whole background upon which this litigation rests must be set forth in substantial detail.

## I. BACKGROUND

A. During the month of October, 1967, a relative handful of students, (a fractional portion of the approximately 4,000 plus enrolled), who were highly critical of the Grambling College administration, for reasons which are dubious, to say the least (Tr. 47, et seq.), began various cataclysmic demonstrations on the campus. The asserted basis of their complaints, said by them to be the stimulus for these demonstrations, was that the College Administration had placed over-emphasis on athletics while grossly neglecting the academic growth and improvement of the institution.[3]

Wednesday, October 25, 1967, at the instigation of most of the plaintiffs, the series of demonstrations began which allegedly were organized to make the College Administration keenly aware of these students' complaints. It is uncontroverted that these demonstrations, as well as certain scurrilous circulars issued after they were expelled, were the work product of a student group known as the "Informers." Almost all plaintiffs in this action were members of that group or were working in active concert with them, and admitted being "leaders" in the campus disruptions which occurred then and thereafter.

On that first day, Wednesday, the demonstrations took the form of marches by one hundred to one hundred-fifty students or more, through classroom buildings, with chanting, clapping, shouting, stomping and obscenities being carried

---

1. 42 U.S.C. § 1983. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 ' 28 U.S.C. § 2201. In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

2. 28 U.S.C. § 1331(a). The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.
 28 U.S.C. § 1343. The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 
 \* \* \* \* \*
 
 (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States[.]

3. In this connection, we must note the academic averages of the various student-plaintiffs, who allegedly were clamoring for "academic excellence." See Tr. pp. 50–53, which reveals that they had a cumulative grade average of 2.25, on a 4.0 perfect standard; or a net average of C–. Cf. The educational qualifications of the members of the Administrative Staff and Faculty, which shows that some fifty-two members of the Faculty hold Doctorate degrees, and that the majority have Masters' degrees.

on by the marchers. This shortly followed a campus "sit-down," which drew few supporters from the student body as a whole. Their admitted purpose was to disrupt classes and gain additional numbers to voice dissatisfaction with allegedly unscholarly conditions at Grambling. Similar incidents occurred in various dormitories on the campus, as well as outside the Library. All students in classes actively were urged to boycott attendance.

While the exact number of students actually involved in these activities was subject to greatly varying estimates, the ultimate effect of the demonstrations was effectively to curtail teaching and administrative activities at the College, as more fully will be pointed out below.

Because it was Homecoming Week at Grambling College, many alumni, parents and friends were scheduled to visit the campus on Saturday. Thus, apparently this particular week was chosen for demonstrations in the name of "academic excellence" to inform outsiders of the widespread "discontent" of students at the College.

Wednesday night many students gathered in the auditorium for a meeting. A number of women students ignored established curfew hours for dormitory residence and remained in the auditorium all night. Although they had no curfew, men students acted in the same fashion.

The demonstrations took on a new element Thursday, October 26. Prior to opening of the Administration Building Thursday morning, hundreds of students, following the "leadership" of the Informers, sealed the building off by blocking all entrances through sheer force of numbers, thus denying Administration officials entrance to the building and thoroughly paralyzing the College's activities. Besides housing the administrative offices charged with operating the daily affairs of the College, the Administration Building contained a number of classrooms as well. Thus classes scheduled in that building were completely inoperative.

Various officials attempted to enter the building but were repeatedly met by a refusal not only in terms of physical force, but also by shouting and songs to the effect that no official was going to turn them [the demonstrators] away. When Dr. R. W. E. Jones, President of the College, arrived, he received a similar welcome and also was presented a list of "mandates" which contained the alleged reasons for the student demonstrations.

B. Realizing that normal activities of the College had been seriously halted or totally obliterated by the blocking of the Administration Building, College Officials called for an assembly of interested students in the Auditorium Thursday morning. At this meeting, President Jones urged an end to the blockade and requested that students return to their normal activities at the school. Upon conclusion of this convocation, the Administration asked that the demonstration "leaders" meet with the school officials at 1:00 that afternoon.

At that time the Interdepartmental Council of the College met with a group of students who had responded to the request for "leaders" to attend. Mr. Willie Zanders, the lead plaintiff in this action and at that time President of the Grambling College Student Council, acted as spokesman for the students. Notes taken at this meeting [4] reveal that several persons, faculty and students alike, voiced complaints and suggested remedies. Proposals for orderly consideration of student grievances were rejected. Instead, Mr. Zanders demanded a meeting of the entire student body and members of the Faculty. He proposed that at this time the faculty and staff, *accused* in the "mandate" handed to President Jones, be allowed to *defend* themselves. Zanders further declared that the Administration Building positively would not be reopened until action was taken on the "mandates" handed to President Jones that morning. All other "leaders" present with him tacitly condoned this.

4. See Exhibit "D–8," in the Record, which contains the notes at that meeting.

Thursday evening the demonstrations continued with speeches in the Auditorium, which now had been sealed off completely to "outsiders." Many students again slept the entire night in the Auditorium and also in the square outside the Administration Building.

Friday, October 27, brought little change except that students also blocked the Education Building, further preventing classroom attendance. No progress was made toward restoring the school to proper operation.[5]

Saturday and Sunday apparently went by without serious incident, after a unit of the State National Guard was called forth by the Governor, and bivouacked a few miles away, and a substantial number of Negro sheriff's deputies from throughout the State took up stations on the College campus. Saturday was Homecoming Day and Sunday was relatively quiet, as admitted by all parties.

However, Monday morning, October 30, the marches were resumed in various buildings on campus and general disruption began again. At this point, the Administration decided to let the Interdepartmental Council consider what action should be taken to restore order. Later that day the Council announced that some twenty-nine students, including the twenty-six plaintiffs herein, involved in the demonstrations, had been expelled. Those expelled were not notified of the disciplinary charges against them nor were they given a chance to present their individual defenses to the Council at the hearing held by that body.

C. November 16, 1967, eighteen of the plaintiffs named in the present action filed a complaint[6] in this Court alleging that their expulsions were violative of their rights, secured by the due process clause of the Fourteenth Amendment, as interpreted in Dixon v. Alabama.[7] *Dixon* required that, prior to expulsion from an institution supported by public funds, a student was entitled to be notified of the charges against him and also was entitled to a "fair" and "reasonable" hearing on those charges. That same day, after finding that the mandates of Dixon v. Alabama had been completely ignored and that plaintiffs would be subjected to immediate and irreparable injury, if expelled under those conditions, without notice or hearing, we granted *ex parte* plaintiffs' application for a temporary Restraining Order immediately reinstating them in good standing with the College. The Order preserved the right of the College to take further disciplinary action after the students had been given notice of the charges and opportunity to be represented by counsel and to be heard contradictorily in opposition to those charges.[8]

In obedience with that Order, the College scheduled a second hearing for Monday, November 27. All expelled students were notified in writing one week in advance of the charges against them;[9] were informed that they had the right to be represented by counsel of their choice, cross-examine all witnesses and present any evidence in their own behalf.

At the November 27 hearing, the Chairman of the Disciplinary Committee, Dean E. L. Cole, obviously unadvised, announced that the College did not intend to present any evidence but instead would listen to the evidence presented by the students alone. Some of the previously expelled students' names were not even

---

5. On Friday night one Administration Official was allowed to enter the Administration Building.

6. This complaint was filed in this District and was designated Civil Action No. 13,378.

7. Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961).

8. See Temporary Restraining Order executed and filed in Civil Action No. 13,378, dated November 16, 1967.

9. A copy of the charges filed against the students is shown by an exhibit filed before the State Board of Education and is designated "G #11." This exhibit is in the form of a letter from Dean E. L. Cole to student-plaintiff Kenneth Armand.

mentioned during the hearing, and after two and one-half hours of testimony, all twenty-nine students were again expelled.

That same day, this Court, upon appropriate application by plaintiffs' counsel, enlarged its previous Temporary Restraining Order to make it clear that the student-plaintiffs could not be expelled until they had been afforded their right of appeal to the Louisiana State Board of Education, which legislatively was empowered to oversee the administrative affairs of the College.[10]

D. Counsel for the students then requested a hearing before the State Board of Education. This request promptly was granted and all parties were notified that a full evidentiary hearing would be held by the Board on December 5, 1967, at its headquarters in Baton Rouge, Louisiana. For the record, but of no significant legal consequence, we note that plaintiffs' counsel objected to the Board's conducting a hearing *de novo*, contending that the only authority possessed by the Board in this regard was a review of the proceedings at the College.

At the hearing before the State Board of Education, all parties were ably and adequately represented by counsel. Pursuant to request by students' counsel, the Board agreed to treat each plaintiff's case individually, and, accordingly, the evidence against each was presented separately. The widest possible latitude was given on direct and cross examination. But for a single exception, plaintiffs chose not to present evidence in their own behalf.[11]

While counsel for plaintiffs persistently contended that it was an economic hardship for the student-plaintiffs to attend, we note that some fourteen plaintiffs in fact were in attendance and only one chose to testify. This is not made as an incriminating observation, but substantially refutes counsel's repeated argument that most students could not attend and present their defenses because of financial problems.

At the conclusion of that hearing, which lasted in excess of thirteen hours, the action of the College was upheld and the students once again were expelled. From the foregoing, the present litigation ensued.

## II. THE COMPLAINT

In their application for a second Temporary Restraining Order, and further injunctive relief, plaintiffs have urged the following five grounds which they contend entitle them to prevail:

(1) The expulsions by Grambling College and the State Board of Education were discriminatory in that "thousands" of students participated in these demonstrations, yet only twenty-nine were chosen for expulsion;[12]

(2) Both the College Disciplinary Committee and the State Board of Education were biased against plaintiffs and, therefore, they did not receive a fair and impartial hearing before either body;

(3) No evidence was presented at either hearing which justified the expulsion of plaintiffs Brown, Caulfield, Clark, Duhon, Freeman, Jones, Marcelous and Major;

(4) No evidence was presented at either hearing within the scope of the formal charges against plaintiffs Brown, Bullock, Caulfield, Clark, Duhon, Ford, Freeman, Giles, Hudson, Jones, Kelly, Marcelous, Major, McGhee, Mitchell, Player, Webb and Williams;[13]

---

10. See LSA–R.S. 17:10.

11. That exception was student Gardner Clark who testified in his own behalf. See Transcript of Hearing before State Board of Education pp. 285–317.

12. While 29 students were expelled, only 26 of them are before the Court in this action, the remaining three apparently being uninterested in obtaining free counsel, expenses, etc.

13. The formal charges were contained in a November 20, 1967 letter from Dean E. L. Cole to the various plaintiffs. These charges were again reiterated at the State Board Hearing in Baton Rouge. They read as follows:

(1) Wednesday, October 25, 1967. Assisted in inciting a group of students to march into the classrooms of the Administration Building, Science Building, Fine Arts Building and the Library,

(5) The conduct of all plaintiffs was a justifiable means of freedom of expression in view of the actions of the College Administration, and, therefore, were protected under the First and Fourteenth Amendments to the United States Constitution.

Prior to disposition of these contentions, we feel it incumbent upon us to make the following historical observations concerning "University and Student," in the American scheme of life, under the Constitution as interpreted by our Courts.

## III. THE UNIVERSITY AND THE STUDENT

A. It is trite, at the least, to say that obtention of a college degree in this Country has gained tremendous stature and personal importance in the last twenty-five to fifty years.[14] In the past eight to ten years, certain aspects of obtaining that degree have presented new problems marked with legal, if not constitutional, overtones. Today, these problems confront not only the student, college or university and the parent, but also the courts as well. The impact and interest generated by them recently,[15] especially since

shouting and singing, etc., and intimidating other students and physically trying to pull many out of classes in an effort to get them to join the marching and boycott classes.

(2) Organized and instructed groups of students to block all entries to the Administration Building for approximately forty-eight hours, day and night, Thursday and Friday, October 27 and 28, 1967.

(3) Led groups of young women students to rebel and disregard curfew hours and remain out of their dormitories all night, Wednesday, Thursday, and Friday, October 25–26–27, 1967.

(4) Took possession of the Auditorium Wednesday, Thursday, and Friday nights, October 25–26–27, 1967, and for most of these periods, no Administration Official was present or allowed to enter. (Transcript before State Board of Education, pp. 40–41.)

A complete and reasonable reading of plaintiffs' complaint shows that they admit participation in some of the activities mentioned in the formal charges supra, but contend that these were within their First Amendment rights protecting freedom of speech and assembly, as well as their right to petition for the redress of "grievances."

14. It has been stated recently: "There existed for many years a question whether or not the opportunity to obtain a college education was a 'right' or a mere 'privilege,' the latter not being entitled to constitutional protection. However, it is well settled today that, regardless of its classification, this is an interest which is entitled to constitutional protection. Hence it should follow, that where a student's collegiate educational opportunities rest in the balance, the proceeding would be classified as adjudicatory even though

the student's interest is not categorized as a 'legal right.' " (Johnson, The Constitutional Rights of College Students, 42 Texas L.Rev. 344, 350 (1964)). "The point, then, is this. That the opportunity to maintain one's association with a university is undoubtedly protected by the equal protection clause." (Van Alstyne, Student Academic Freedom and the Rule-Making Power of Public Universities: Some Constitutional Considerations, 2 L.Trans.Q. 32 (1965)).

In Hamilton v. Regents of University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934), the Supreme Court held that the "privilege" of attending a university as a student came not from federal sources, but was given by the State. This has been affirmed recently in Steier v. New York State Education Commissioner, 271 F.2d 13, 16 (2d Cir. 1959). While the present status of Hamilton has been questioned (School District of Abington v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), concurring opinion of Justice Brennan, 374 U.S. at 251, 83 S.Ct. at 1586), it has not been specifically overruled.

15. For example, see: Symposium: Student Rights and Campus Rules, 54 Cal. L.Rev. 1 (1966); Johnson, The Constitutional Rights of College Students, 42 Texas L.Rev. 344 (1964); Monypenny, University Purpose, Discipline and Due Process, 43 N.D.L.Rev. 739 (1966); Van Alstyne, Student Academic Freedom and the Rule-Making Powers of Public Universities: Some Constitutional Considerations, 2 Law Trans.Q. 1 (1965); Seavey, Dismissal of Students: "Due Process," 70 Harv.L.Rev. 1406 (1957); Comment, Legislation: College Disciplinary Proceedings, 18 Vand.L.Rev. 819 (1965); Comment, Procedural Limitations on the Expulsion of College and University Stu-

the landmark decision by the Fifth Circuit Court of Appeals, in Dixon v. Alabama State Board of Education, 294 F.2d 150 (1961), is of the greatest importance in academic life.

That decision, coming after many years of frustration and confusion, in the area now known as "student rights," recognized fundamentally that at tax-supported institutions of higher learning students have certain constitutional rights when faced with possible expulsion.

In a recent symposium, aptly entitled "Student Rights and Campus Rules" (54 Cal.L.Rev. 1), the acute problem area was illustrated vividly by the following observation:

"Broadly stated, the mission of the university is to impart and to advance the boundaries of knowledge. This carries with it administrative responsibility to control and regulate whatever conduct and behavior of the members of the university family impedes, obstructs, or threatens the achievement of its educational goals. In turn it is the responsibility of students and faculty to refrain from conduct that obstructs or interferes with the educational and research objectives of the university, which impairs the full development of the mutual process of teaching and learning, or which imposes restraints upon the advancement of knowledge. In part, these mutual responsibilities are reflected in rules and regulations ordinarily accepted as a matter of course, but which are now the target of intense reaction that goes almost to the point of rejecting the authority of the university to make any rules at all. To be sure, the point of the attack is almost entirely directed against those rules and regulations which affect political speech and assemblage on campus and which open the door to imposition of academic sanctions for off-campus activity, more particularly of course, for participation in so-called 'civil disobedience' demonstrations." [16]

In further exposition of the rights and responsibilities of assemblage and freedom of expression, the author notes:

"The rights of freedom of assemblage and freedom of expression must not be exercised in such a way as to interfere with the operations of classrooms and laboratories, with the availability and use of libraries and other facilities, or with the conduct of the university's administrative responsibilities. Reasonable regulation to prevent such interference is clearly within the rule-making jurisdiction of the university." [17]

B. Through many years two theories traditionally have been used to characterize the basic relations existing between university and student. One is commonly known by the Latin phrase "in loco parentis" and the other by the legal term "contract."

In the quite early case of Stevens v. Fassett, 27 Me. 266, 276 (1847), it was held that the right of a parent to keep his child in order and obedience was secured by the common law, and therefore the parent lawfully could correct his child under age in a reasonable manner, for the benefit of his personal welfare

---

dents, 10 St. Louis U.L.J. 542 (1966); Comment, Private Government on the Campus—Judicial Review of University Expulsions, 72 Yale L.J. 1362 (1963); Note, Administrative Law—Due Process —Expulsion from Public University Requires Notice and Hearing, 15 Vand.L. Rev. 1005 (1962); Note, The College Student and Due Process in Disciplinary Proceedings, 1962 U.Ill.L.F. 438.

16. Sherry, Governance of the University: Rules, Rights, and Responsibilities, 54 Cal.L.R. 27 (1966); similar statements concerning the rights and responsibilities have been made. See Monypenny, supra, p. 744: "They [the students] should be free to take action not directly disruptive of university functions." Also, Joint Statement on Rights and Freedoms of Students, AAUP Bulletin, Winter 1967, p. 367, Article IV., B. " * * * They [the students] should always be free to support causes by orderly means which do not disrupt the regular and essential operation of the institution."

17. Sherry, supra, p. 31.

and education. Accordingly, a parent could delegate a part of his parental authority during his life to the tutor or schoolmaster, who was then "in loco parentis," with such allocable portion of the parent's power as was necessary to answer the purpose for which he was employed. This doctrine primarily has been used as a defense in suits involving potential tort liability of school teachers when administering some type of corporal punishment to students of tender years.[18] Viewed in this light, the doctrine is of little use in dealing with our modern "student rights" problems.[19]

On the other hand, the contract theory defines the basic relationship between university and student in terms of rights and obligations which naturally lends itself to a more fitting position within the judicial framework. While most of the emphasis and interest in the field of student rights has occurred in recent years, concern for these rights was exhibited over sixty years ago in Koblitz v. Western Reserve University,[20] where the "contract" theory was defined this way:

"There may be authorities cited that even though the courts have no visitatorial power and cannot undertake to regulate the domestic affairs of the college such as passing upon the reasonableness of the course of study, the reasonableness of the mode of discipline or what the discipline shall be, yet if the authorities governing the school have been indiscreet in their punishment and have inflicted unnecessary and uncalled for punishment, and such indiscretion is carried to that extent that it does not show a spirit of fairness nor an intention to do justice by the pupils, they will interfere so far as to require the authorities governing the college to do justice and give the party offending such consideration as it is necessary to arrive at the proper conclusion as to his guilt or innocence and as to the nature of his offense." (21 Ohio Cir.Ct.R. 152.)

The court went on to characterize the university-student relation as a contract and then stated:

"What then are the terms of such a contract? He [the student], upon making that contract, agrees to submit himself to the *reasonable discipline* of the school. He agrees that his conduct and character shall be such as to in no manner be detrimental to the school; and this conduct and character he must bear in all his relations with the school and with other students. He agrees that he will conform to the customs of the school; if it is the custom of the school that the professors shall discipline the scholars, reprimand and inflict such punishment as is proper under the circumstances, then he has agreed that he will conform to that custom. And he agrees that when he fails in any of the duties devolving upon him, the authorities over the school may discipline him in such manner as shall be proper under the circumstances.

"The University agrees with him that it will impart to him instructions; that it will aid him in the ordinary ways in his studies; that it will treat him fairly; that it will give him every opportunity to improve himself, and that it will not impose upon him penalties which he in no wise merits, and that it will deal with him impartially." 21 Ohio Cir.Ct.R. 154, 155 (Emphasis added)

Application of the contract theory to similar situations has led to varying results in terms of specific rights and ob-

18. See Suits v. Glover, 260 Ala. 449, 71 So.2d 49, anno. 43 A.L.R.2d 465 with cases collected (1954).

19. While the principle was dispositive in one university case the conflict was not between university and student: Gott v. Berea College, 156 Ky. 376, 161 S.W. 204 (Ky.App.1913). However, the doctrine was recognized in John B. Stetson Univ. v. Hunt, 88 Fla. 510, 102 So. 637 (1924), although the case was not decided on that basis.

20. Koblitz v. Western Reserve University, 11 Ohio Cir.Dec. 515, 21 Ohio Cir.Ct.R. 144 (1901).

ligations attributed to student and university.[21] Some degree of discrepancy in these results has been attributed to the public school versus the private school distinction. Judicial analysis in this respect generally has been that students in private schools do not have the same protected rights as those in public institutions concerning disciplinary proceedings because the constitutional reach of the Fourteenth Amendment clearly extends to State action but not to private action.[22] The validity of this distinction has been questioned in at least one case.[23]

Regardless of which theory may be applied, it now is generally conceded that colleges and universities have the inherent power to promulgate reasonable rules and regulations for government of the university community; likewise, students have corresponding responsibilities in their observance of those rules and regulations.[24] Notwithstanding such, as is so often the case, mere articulation of a well-intentioned but abstract principle does not always provide the pragmatic and just answer. A typical illustration of this is:

" 'Fair play' is the key to the problem or issue of a student's status; the courts have said this for over half a century. There is no need to redefine

21. See People ex rel. Cecil v. Bellevue Hospital Medical College, 60 Hun. 107, 14 N.Y.S. 490 (1891), medical student denied right to take final exam after complying with all requirements of school and court interceded in his behalf; Booker v. Grand Rapids Medical College, 156 Mich. 95, at p. 99, 120 N.W. 589, at p. 591 (1909) ; "In fact, when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom."; Anthony v. Syracuse Univ., 224 App.Div. 487, 231 N.Y.S. 435 (S.C.App.Div.1928), private university dismissed student without notice of any kind pursuant to specific regulation which held that this action was proper. This dismissal was upheld on the contract theory. Guillory v. Administrators of Tulane Univ., 203 F.Supp. 855 (E.D.La.1962), modified, 212 F.Supp. 674 (E.D.La.1962); John B. Stetson v. Hunt, 88 Fla. 510, 102 So. 637 (1924), private university, recognizing relationship in terms of contract, dismissed student and court sustained dismissal when facts clearly showed student's misconduct. See also People ex rel. Bluett v. Board of Trustees of the University of Illinois, 10 Ill.App.2d 207, 134 N.E.2d 635, anno. 58 A.L.R.2d 899 (1956), where it was held that a college student is not deprived of any legal right in being expelled from a private school on the grounds of cheating in examinations, notwithstanding the absence of any formal charge against him and of a formal hearing at which he would be confronted with the accusing witnesses and given the opportunity to cross-examine them. A scathing analysis of that decision was set forth by Professor Warren Seavey (Dismissal of Students: "Due Process," supra) wherein he made the now oft-

quoted observation: "At this time when many are worried about dismissal from public service, when only because of the overriding need to protect the public safety is the identity of informers kept secret, when we proudly contrast the full hearings before our courts with those in the benighted countries which have no due process protection, when many of our courts are so careful in the protection of those charged with crimes that they will not permit the use of evidence illegally obtained, our sense of justice should be outraged by denial to students of the normal safeguards. It is shocking that the officials of a state educational institution, which can function properly only if our freedoms are preserved, should not understand the elementary principles of fair play. It is equally shocking to find that a court supports them in denying to a student the protection given to a pickpocket." 70 Harv.L.Rev. 1406, 1407.

22. This point adequately was discussed in Dixon v. Alabama State Board of Education, 294 F.2d 150, 159 (5th Cir. 1961).

23. Guillory v. Administrators of Tulane University of La., 203 F.Supp. 855, 858 (E.D.La.1962), (Hon. J. Skelly Wright, J.) : "At the outset, one may question whether any school or college can ever be so 'private' as to escape the reach of the Fourteenth Amendment. In a country dedicated to the creed that education is the only 'sure foundation * * * of freedom,' 'without which no republic can maintain itself in strength,' institutions of learning are not things of purely private concern."

24. See notes 15–17, supra, and also Goldberg v. Regents of Univ. of Cal., 57 Cal. Rptr. 463 (Cal.Ct.App.1st Dist.1967).

the relationship of college and university and its students, nor is there any need to call for 'adversary' proceedings * * * The wisdom of the courts in continuing to respect the traditional discretions of the universities in the area of discipline can probably best be appreciated by the educator who understands the broad sweep of the educational implications of discipline that extend beyond legal due process in the total educational process." [25]

However much we may agree with that broad statement, courts increasingly have found it necessary to enter decrees to fit within the framework of "fair play." These orders necessarily encroach upon the well-entrenched, and sometimes severely administered, authority of college and university officials to maintain discipline in their own houses. This judicial entrance into the arena of student disciplinary matters has been a reluctant one, but has come about because of serious, and admittedly complex, considerations which have arisen in the administration of those rules and regulations.[26]

## III. DISCIPLINARY PROCEDURES

A. While the *public interest* in protection of individual rights and, as far

as we are here concerned, student rights in particular, definitely has reached unparalleled heights only in the last few years, jurisprudence concerning the specific requirements for a "fair hearing" in student disciplinary matters is not new. Neither is it the product of the federal judiciary intervening in affairs traditionally left to administration by the states.

The fountainhead of such recent concern, Dixon v. Alabama State Board of Education, enunciated by Judge Rives, speaking for the Court, decided only as recently as 1961, laid down the following guidelines relative to student discipline at tax-supported or public institutions: (1) A student should be given notice that he is charged with certain misconduct and this notice should contain a statement of the charges and the grounds, if proven, which would justify the particular sanction involved; (2) the student should be given the names of the witnesses against him and either an oral or written report on the facts which each would testify to; (3) the student should be given the opportunity to present to the hearing body his own defense and produce it either orally or in writing; (4) if the hearing is not before a Board of Education, the findings of

25. Note, The College Student and Due Process in Disciplinary Proceedings, 1962 U.Ill.L.F. 438, 451.

26. Part of the problem may stem from a lack of understanding of the tremendous impact university disciplinary measures might have on a person's future. 54 Cal.L.Rev. at p. 26.

In addition to an unqualified belief, that the opportunity to maintain one's association as a student in a university, is protected by the equal protection clause, Professor Van Alstyne states:

"That whether particular university rules restrict the opportunity in an arbitrary fashion which denies equal protection is a function of several variables. That among these are: (1) the legitimacy of the purpose served by the rule; (2) the relative significance of that purpose in discharging the lawful functions of the university; (3) the substantiality of the connection between that purpose and the general or particular conduct

forbidden by the rule; (4) the substantiality of the connection between that purpose and the punishment prescribed by the rule; (5) the relative importance to the individual student-citizen of the activity which he is forbidden to pursue; (6) the relative importance of the interest which will be denied him if he violates the rule; (7) the availability of alternative means for protecting the university's legitimate interests without so adversely affecting the student's educational opportunities." 2 L.Trans.Q. 33 (1965).

Within our own circuit, the hesitancy of the judiciary in questioning the wisdom of the specific rules involved recently has been expressed. Burnside v. Byars, 363 F.2d 744, 748 (5th Cir. 1966); Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966); Due v. Florida Agricultural and Mechanical University, 233 F.Supp. 396, 403 (N.D.Fla.1963).

the determining body should be presented in a report open to the student's inspection. These principles, just and reasonable in every respect, are not new to some states.

■ B. Referring again to the older but still viable decision in Koblitz v. Western Reserve Univ., 21 Ohio Cir.Ct.R. 144 (1901), we note:

"Custom, again, has established a rule. That rule is so uniform that it has become a rule of law; and, if the plaintiff had a contract with the university, he agreed to abide by that rule of law, and that rule of law is this: That in determining whether a student has been guilty of improper conduct that will tend to demoralize the school, it is not necessary that the professors should go through the formality of a trial. They should give the student whose conduct is being investigated, every fair opportunity of showing his innocence. They should be careful in receiving evidence against him; they should weigh it; determine whether it comes from a source freighted with prejudice; determine the likelihood, by all surrounding circumstances, as to who is right, and then act upon it as jurors, with calmness, consideration and fair minds. When they have done this and reached a conclusion, they have done all that the law requires of them to do."

In State ex rel. Sherman v. Hyman, 180 Tenn. 99, 171 S.W.2d 822 (Sup.Ct. Tenn.1942), relators were medical students expelled from school for allegedly selling examination papers. They complained that their dismissals came without any semblance of a hearing, and, therefore, that they had been deprived of the right to present their defense and cross-examine the witnesses against them. The record clearly established that all relators had been afforded a fair hearing and their expulsions were affirmed. In coming to grips with the real issue in the case, the Supreme Court of Tennessee queried:

" * * * [W]e are confronted with the question, first, was it such a hearing as meets the requirements of justice, both to the school and these relators? and, second, were they given a fair and reasonable opportunity to make their defense?" (171 S.W.2d 822, 825.)

After recognizing the principles established more than forty years earlier in Koblitz, supra, the court answered its own query this way:

"It cannot be denied that the governing authority of the College of Medicine had the inherent right to expel students for acts which are contrary to good morals, which tend to lower the students of the school in any respect, and such authority will not be required to follow technical rules of procedure in bringing to trial students who have committed an offense against the institution. We think the student should be informed as to the nature of the charges, as well as the names of at least the principal witnesses against him when requested, and given a fair opportunity to make his defense. He cannot claim the privilege of cross-examination as a matter of right. The testimony against him may be oral or written, not necessarily under oath, but he should be advised as to its nature, as well as the persons who have accused him. Students should not be compelled to give evidence incriminating themselves or which might be regarded as detrimental to the best interests of the school. Every governing authority should impress upon all students their duty to protect the honor and integrity of the school. As to the right to meet his accusers face to face in an investigation of wrongdoing, we cannot fail to note that honorable students do not like to be known as snoopers and informers against their fellows, that it is most unpleasant even when it becomes a duty. In these circumstances they should not be subjected to a cross-examination and, as is often seen in a trial court, to their

displeasure if not their public humiliation. It would be subversive of the best interests of the school, as well as harmful to the community." (171 S.W.2d 822, 826)

Refinements definitely have been made upon these principles. One case clearly has recognized the right to counsel as an integral part to a fair hearing between guidance counselor and student when such is requested by the student, and the action against the student results from reports of juvenile authorities.[27] Another has adopted definite time periods within which notice must be given and a hearing held.[28] Regardless of the specific case,[29] the prime point made by all these decisions should be clear. If minimum standards of fairness, having been repeatedly articulated for over fifty years, are not afforded to students in disciplinary cases, then, as is becoming the rule rather than the exception in all fields today, courts, state and federal, will draft rules on

an *ad hoc*, a case by case, basis to insure that rights of students adequately are protected.

It often has been said,[30] but bears repeating until the point plainly is made, that we do not cherish the task of intervening in matters which properly should be disposed of by local or state officials charged with administration in various fields. But if the duty is thrust upon us due to inaction or wrong action on their part, we cannot and will not abandon that task regardless of our desire to abstain.

There is a wealth of authority to guide school officials in setting up just and orderly procedures within their already existing frameworks. Solutions offered to these serious aspects of student discipline are as numerous as the writers offering comment.[31] Many colleges and universities already have begun re-evaluation of their present procedures. While full scale adversary trials definitely are not required, it is gener-

27. Madera v. Board of Education of City of New York, 267 F.Supp. 356 (S.D.N.Y.1967) relying on Powell v. State of Alabama, 287 U.S. 45, 68, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932) and Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

28. Schiff v. Hanna, 282 F.Supp. 381 (W.D. Mich.1965).

29. Other recent cases involving the right to a hearing in disciplinary matters include: Wood v. Wright, 334 F.2d 369 (5th Cir. 1964), where no hearing was afforded; Due v. Florida Agricultural and Mechanical University, 233 F.Supp. 396 (N.D.Fla.1963) where adequate hearing was afforded; Tinker v. Des Moines Independent Comm. School District, 258 F.Supp. 971 (S.D.Iowa 1966), aff'd en banc, 383 F.2d 988 (8th Cir. 1967), certiorari granted by Supreme Court, 390 U.S. 942, 88 S.Ct. 1050, 19 L.Ed. 1130, 36 Law Week 3323, where expulsion was upheld and the wide discretion accorded to school authorities was recognized; Wasson v. Trowbridge, 269 F.Supp. 900 (E.D.N.Y.1967), reversed 382 F.2d 807 (2d Cir. 1967) to entitle appellant to hearing and show bias of members, which provides a novel approach in suit by a Merchant Marine Academy student alleging he had the right

to counsel at his hearing. Suit dismissed because it was essentially against United States as defendant which enjoyed sovereign immunity against such actions; Steier v. New York State Education Commissioner, 271 F.2d 13 (2d Cir. 1959).

30. The reason for reluctance to enter this field is primarily a selfish one: "As so well stated by Judge Wyzanski in Cranney v. Trustees of Boston University, D.C., 139 F.Supp. 130, * * * to expand the Civil Rights Statute so as to embrace every constitutional claim such as here made would in fact bring within the initial jurisdiction of the United States District Courts that vast array of controversies which have heretofore been raised in state tribunals by challenges founded upon the 14th Amendment to the United States Constitution. It would be arrogating to United States District Courts that which is purely a State Court function. Conceivably every State College student, upon dismissal from such college, could rush to a Federal Judge seeking review of the dismissal." (271 F.2d 13, 18.) We add that it also would put Federal District Courts in the position of "superboards" of education, which is highly undesirable to say the least.

31. See note 15, supra.

ally agreed that the bare essentials set forth in *Koblitz, Sherman,* and *Dixon* are essential to a fair hearing.

 From the standpoint of administering justice, we strongly urge that this State, in its own wisdom, encourage their educational institutions to review their existing procedures to insure that they have adequate procedural machinery to implement the minimum standards already in force. As an enlargement on previous decisions, we strongly recommend that disciplinary rules and regulations adopted by a school board be set forth in writing and promulgated in such manner as to reach all parties subjected to their effects. In colleges and universities, this easily can be accomplished through distribution of handbooks or catalogues. Moreover, we recommend that each disciplinary procedure incorporate some system of appeal. This could consist in review of disciplinary decisions by some higher official within the school itself, such as the president or vice-president. The practicality of this suggestion lies in the fact that this would evidence one more sign of the particular institution taking initiative carefully to safeguard the basic rights of the student as well as its own position, prior to disciplining him for misconduct.

Of course nothing we have said is intended in any way to affect existing sanctions which colleges and universities must impose for *academic* deficiencies. What we have said relates solely to cases involving personal conduct of students. In summary we note:

> "In short, procedural fairness must not be left to chance or to ad hoc extemporization but must be considered as a fundamental part of the exercise of the university's disciplinary authority and receive the same careful consideration that is required in the enactment of substantive rules and regulations." [32]

## V. MERITS OF THIS CASE

 As previously noted, this application was for a renewed Restraining Order reinstating these twenty-six expelled plaintiff-students at Grambling College until a full hearing for a preliminary injunction might be heard. At the outset, we note that a preliminary question to be answered is whether the student-plaintiffs here received "due process" under the standards set forth in Dixon v. Alabama. On this record, we must find that the hearing at Grambling College was not sufficient to meet the rudimentary elements of fair play set forth in *Dixon,* and therefore those proceedings will be, and have been, totally disregarded in our ultimate conclusions. The exact contrary is the case, however, with respect to the State Board hearing, where plaintiffs were accorded every conceivable element of "due process," in a hearing lasting thirteen hours.

A. In their first cause of action, plaintiffs allege that their expulsions resulted from systematic, arbitrary and discriminatory selection of them by the college officials from "thousands" of demonstrating students. The essence of this contention is that their expulsions resulted from plaintiffs' constant criticism of the college administration and not the alleged misconduct which was presented in the formal charges. Thus their argument follows that *all* activities of the student-plaintiffs were protected by the First and Fourteenth Amendments to the United States Constitution. Plaintiffs' complaint for relief puts it this way:

> "Plainly, this is not a case in which litigants are simply claiming that other persons who engaged in similar conduct were not proceeded against. Plaintiffs will show that the selection was arbitrary and systematic and, in fact, constituted unlawful retaliation

32. Sherry, supra, p. 38.

for the exercise of First Amendment rights by the students involved."[33]

In support of their position, plaintiffs rely heavily on the landmark decision of Yick Wo v. Hopkins[34] which, on the basis of the equal protection clause of the Fourteenth Amendment, clearly struck down intentional, arbitrary and discriminatory enforcement of the law against a specific "class" of people. Plaintiffs candidly recognize that to succeed in this contention, they must show a "systematic and intentional discrimination."[35]

The basic fallacy in plaintiffs' stated contention, and that which renders it without merit, is that at least one of the activities clearly engaged in by them was *not* protected by the First Amendment, and was well beyond its ambit. The second charge presented by the College and the State Board against them was:

"You are hereby charged with the following acts:

\*　　\*　　\*　　\*　　\*　　\*

"2) Organized and instructed groups of students to block the entries to the Administration Building for approximately forty-eight hours, day and night, Thursday and Friday, October 26 and 27, 1967."

Counsel for plaintiffs have cited no authority, and we have found none, which stands for the proposition that activity which amounts to taking possession, physically and by force of numbers, of the College's property, thus effectively paralyzing operation of this public enterprise, is protected activity under the First Amendment. In fact, they have conceded the contrary to be true (Tr. 225). That plaintiffs totally blocked the Administration Building of Grambling College and denied all college personnel admission to that building for two full days is completely uncontradicted. In fact, one of the Informers, student-plaintiff Cleveland Moore, testified[36] as follows:

"MR. McFERRIN: You were there to block the building and keep the faculty and administrative personnel from entering?

CLEVELAND MOORE: That's right.

MR. McFERRIN: How long did you remain there?

CLEVELAND MOORE: Maybe two hours.

MR. McFERRIN: You had no other activities you were actually in other than blocking this building?

CLEVELAND MOORE: That's right.

THE COURT: Did you realize that the blocking of the Administration Building effectively prevented the college from operating at all?

CLEVELAND MOORE: Yes, I did." (Tr. pp. 153–154)

It was stipulated (Tr. 238) that eighteen of the twenty-six plaintiffs, who were denied reinstatement by this Court,

---

33. See Plaintiffs' Memorandum in Support of Application for Temporary Restraining Order and Motion for Preliminary Injunction, p. 6.

34. 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

35. Edelman v. People of California, 344 U.S. 357, 359, 73 S.Ct. 293, 97 L.Ed. 387 (1953); Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944): "The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination. This may appear on the face of the action taken with respect to a particular class or person \* \* \*, or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself \* \* \*. But a discriminatory purpose is not presumed \* \* \* there must be a showing of 'clear and intentional discrimination', \* \* \*."

36. When reference is made to the hearings held in this Court, the abbreviation "Tr." will be used. When referring to the proceedings before the State Board of Education, the abbreviation "State Bd." will be used.

participated in the blockade, along with others, for a period of some forty-eight hours, or more.

In our ruling herein, we have overlooked completely the highly disruptive marches through the College buildings, reasonably attributable to plaintiffs, as well as the vandalism to its property, which, by reasonable inference, might be imputable to their initial and continued incitement, even after they were expelled. But we do hold firmly that blocking of the Administration Building clearly was outside the scope of protection afforded by the First Amendment. In so doing we find as a fact that the basis for these expulsions was due actually to the illegal and unconstitutional conduct of plaintiffs —not because of their criticism of the College Administration.

The United States Supreme Court recently has expounded upon the freedoms guaranteed under the First Amendment. In Cox v. State of Louisiana,[37] the Court made the following observation:

> "A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations." (379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965))

In contradistinction, in Edwards v. South Carolina,[38] it was held that the demonstrations were peaceful and nondisruptive in every respect and the Court noted:

> "There was no obstruction of pedestrians or vehicular traffic within the State House grounds. No vehicle was prevented from entering or leaving the horseshoe area." (372 U.S. 229, 231, 83 S.Ct. 680, 681, 682 (1963))

In both Cox and Edwards, the Court found that the activities of the demonstrators were peaceful and nondisruptive, and consequently were protected by the First Amendment. But we do not have here a similar situation and the language quoted from Cox is squarely applicable to the blockading students in this case.

We find the principles adhered to in National Labor Relations Board v. Fansteel Metallurgical Corp., and Adderly v. State of Florida[39] should have great weight in our decision here. In Fansteel, disgruntled workers decided to voice their discontent by a sit-down strike, taking over and holding, by force of numbers, two of the employer's key buildings. Some strikers were discharged for "seizure and retention of the buildings."

The Court in Fansteel had little trouble in upholding the discharge of employees engaged in the sit-down strike which had the effect of a physical takeover of Company buildings. In its analysis, the Court, speaking through Chief Justice Hughes, declared:

> "Here the strike was illegal in its inception and prosecution. As the Board found, it was initiated by the decision of the Union committee 'to take over and hold two of the respondent's "key" buildings'. It was pursuant to that decision that the men occupied the buildings and the work stopped. This was not the exercise of the 'right to strike' to which the Act referred. It was not a mere quitting of work and statement of grievances in the exercise of pressure recognized as lawful. It was an illegal seizure of the buildings in order to prevent their use by the employer in a lawful manner and thus by acts of force and violence to compel the employer to submit. When the em-

37. Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) presented a case where petitioner was convicted of an anti-trespass type of statute.

38. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) involved a situation where demonstrators peacefully assembled on the grounds of the State House.

39. N.L.R.B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939); Adderly v. State of Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

ployees resorted to that sort of compulsion they took a position outside the protection of the statute and accepted the risk of the termination of their employment upon grounds aside from the exercise of the legal rights which the statute was designed to conserve." (306 U.S. 256, 59 S.Ct. 496)

The similarity in *Fansteel* and this case is striking. Insofar as the demonstrations at Grambling involved "taking over" the College's property, they clearly were illegal. It was not until the Administration Building was physically seized that College officials finally intervened. Initially, they attempted to meet with the "leaders" to work out a plan for orderly consideration of their alleged grievances. This plan was rejected flatly and the College administration was told that the blockade would continue until the "mandates" of the students were met. Such action by the student-plaintiffs, whom we refused to reinstate, similar to that of the employees in *Fansteel*, was not a mere boycott of classes and statement of grievances in a manner recognized as lawful, but was an illegal seizure of the Administration Building to prevent its lawful use by College officials in their orderly conduct of the College's activities. It amounted not only to a total disruption of classes scheduled to be held in that building but, indeed, of the entire College. By taking such a course of action, the students deliberately accepted the risk of expulsion by attempting to rectify their "grievances" in a manner clearly beyond the bounds of their First Amendment rights.

Analogous is Adderly v. State of Florida, supra, where students from Florida A. and M. marched from the college campus to a jail about a mile away to "demonstrate" against arrests of fellow students. Their demonstrations took the form of what amounted to a "curtilage of the jailhouse." [40] In upholding their convictions under a Florida anti-trespass statute, the Supreme Court said:

"The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. For this reason there is no merit to the petitioners' argument that they had a constitutional right to stay on the property, over the jail custodian's objections, because this 'area chosen for the peaceful civil rights demonstration was not only "reasonable" but also particularly appropriate * * *.' Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and whereever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on, Cox v. Louisiana * * *. We reject it again. The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose." (385 U.S. 47–48, 87 S.Ct. 247)

Necessarily following these rulings by our Nation's highest Court, we must and do find that the blockade activities of these students were not protected by the First Amendment. Our decision is buttressed by plaintiffs' admission, for the first time in their application for injunctive relief pending appeal (See No. 25,-637, Docket, Fifth Circuit Court of Appeals), that:

" * * * [A]ppellants conceded that there was sufficient evidence before the appellee Louisiana State Board of Education to permit the conclusion that they had engaged in conduct— blocking the administration building— that is not within any constitutional protection and that, under proper circumstances, would serve as a valid basis for disciplinary proceedings against them. Appellants' position was that their right to free speech under the First Amendment and their rights to the equal protection of the law secured

40. 385 U.S. 39, 47, 87 S.Ct. 242, 17 L.Ed.2d 149.

by the Fourteenth Amendment were violated by the expulsion proceedings against them not because their conduct in blocking the building was constitutionally protected, but (1) because they were singled out of hundreds of participants in this activity and (2) because the sole basis of their selection was the repeated criticisms of the Administration by the Informer Group, with which they are associated." [41]

Quickly reaching the crux of this allegation, we already have shown, by review of the facts and authorities heretofore cited, that at least a most substantial basis for the expulsions was plaintiffs' participation in this illegal activity.

Grambling President R. W. E. Jones, who testified at the hearing before the State Board of Education and before this Court, clearly stated that these students were expelled for their participation in the illegal activity with which they were charged.[42] Prior to any action taken against these students, the administration, led by President Jones, sought an orderly and peaceful solution to the claimed student grievances. These suggestions were emphatically rejected at the meeting between the leaders of the demonstrations and the College Administration. President Jones further testified that there had been a prior demonstration in April, 1967, and he had met with a group of students to discuss their complaints.[43]

On cross examination, he indicated that disciplinary sanctions imposed upon these plaintiffs would have been less stringent had the demonstrations been confined to orderly protests in the form of marching and singing.[44] As a fact-finder, we believe Dr. Jones' testimony. (Rule 52 (a) F.R.Civ.P.)

While the disciplinary hearings conducted at Grambling College form no part of our consideration in this matter, the

41. Motion for Injunctive Relief Pending Appeal, p. 8.

42. "THE COURT: Dr. Jones, one of the questions which has not been asked of you either by the plaintiffs' attorneys or by the attorneys representing the State Board and you is as follows:

Out of hundreds, if not several thousand students who participated in the rioting, and that sort of thing, why was it that you and your Administration chose to expel these plaintiffs and some others who have not joined in the suit?

[THE COURT:] In other words, what was your basic reasoning on that, sir?

DR. JONES: On Thursday morning, the 26th day of October, when the doors were blocked and several of the heads were there, there were students standing around who wanted to go to class. We put our heads together and said. 'We must do something.' And one idea was to have the classes in the auditorium.

As we thought about that, someone said, 'Let us have a convocation. All those students who wish to go to school, go to the auditorium.'

Quite a number went. I got up and talked and I told the students, I said that as long as there was an orderly protest there was nothing to be done, but as soon as the students marched through the buildings as I stated, and as soon as they blocked the doors, that was wrong and they should not have done it.

As I talked, I said, 'Will someone notify the leaders to meet with the inter-departmental council at 1:00 in the Little Theatre.'

So, at 1:00 the inter-departmental conference assembled and a few minutes later the group came in. I asked for the leaders and the leaders came in.

THE COURT: Were they the same as these plaintiffs?

DR. JONES: Yes, sir.

THE COURT: And a few others?

DR. JONES: Yes, sir.

We talked at least for about two hours.

Before this, I called a faculty meeting and Dean Cole was the Chairman and tried to come to some conclusion and the conclusion can be found in the Minutes where the President stated the doors would not be unblocked.

THE COURT: Who was that?

DR. JONES: Mr. Zanders. That is in the last paragraph of the Minutes of that meeting."

(Tr. pp. 97–99)

43. Tr. p. 113.

44. Tr. p. 114. "MR. NUSSBAUM: If it were shown a student committed no acts after October 25, that student should not be expelled?

DR. JONES: I will assume the penalty would have been lighter.

lengthy proceedings before the Louisiana State Board of Education clearly substantiated the validity of the College's expulsions. At that hearing, the opposing sides were ably represented by counsel and were told, prior to the proceedings, that they would be allowed to present any and all evidence, by witnesses or affidavits, to support their respective contentions. The College chose to present its case by witnesses; the students chose, apparently upon advice of extremely capable counsel, not to introduce any evidence except the testimony of Gardner Clark.

We make this observation for two purposes. First, the hearing before the State Board more than satisfied the "rudiments of fair play" set forth in Dixon v. Alabama State Board of Education,[45] Second, plaintiffs have alleged that they were denied the opportunity to present evidence tending to establish the intentional discrimination of which they complain. In answer to this we say that every opportunity to do so was given them at the State Board hearing. Indeed, the record of that hearing contains several instances in which counsel for plaintiffs tried to establish systematic expulsion of these students. These instances are set out in the margin.[46]

Moreover, while the hearing in this Court primarily was designated as one to determine whether these plaintiffs, seeking to invoke the equity jurisdiction of this Court, had come into Court with "clean hands," Counsel for plaintiffs was given extreme latitude in cross-examination in seeking to establish the reason for the expulsions.[47] As previously noted, President Jones, in response to questioning of the Court, testified that the students were expelled because of their misconduct and not for their criticism of College officials.

■ Finally, upon cross-examination it was suggested that the sole basis of expulsion of these students was their attendance at the October 26th meeting between the "leaders" and the administration. While we do not agree that this was the sole, or only valid, basis for their expulsions, proof of the correctness of that allegation would not render the expulsions invalid.[48]

Those plaintiffs, who were not reinstated by us, have admitted their participation in blocking the Administration Building and have admitted that this was an illegal method of demonstration.

■ Analogous cases in the field of labor law are replete with instances, especially in "wildcat strike" situations, where "the leaders" of these illegal strikes were singled out from huge numbers and discharged from employment because of their leadership, instigation or

---

**45.** At the hearing before the State Board of Education which lasted some thirteen hours and produced a 581-page transcript, the requirements of *Dixon* were met in the following particulars:
(1) Notice of the charges was given well in advance and the grounds for expulsion were contained in those charges;
(2) The students were given an opportunity to confront the witnesses against them, and cross-examine them at length if desired;
(3) The students were given the opportunity to present their own defenses to the Board.

**46.** Examples of questioning along this line may be found in "State Bd." pp. 86–88

(attempts to show that athlete who allegedly had stolen a stereo was not disciplined. This is completely unconnected to this proceeding and no substantiation of that claim followed.); pp. 92–97 (where attempts to show another instance of lack of discipline where athletes involved).

**47.** Tr. 106–114.

**48.** Cf. United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), where John L. Lewis, president of that Union was singled out for punishment, by fine, as the "leader" of that large group.

mere participation in these activities.[49] An employer is not relegated to discharging an entire work force in an effort lawfully to restore order to his business as a result of an illegal labor practice. By the same process of reasoning, surely college officials are not relegated to dismissal of an entire student body, or a large portion thereof, in order to stop illegal activity and restore order on their campus, especially when the instigators or leaders of such activity can be definitely identified and removed, as here.

The wide discretion traditionally given school officials in administration of their affairs has been affirmed numerous times. Such discretion also exists in the hands of public officials administering enforcement of criminal laws. This discretion has been granted by statute[50] and has been upheld in our jurisprudence, most recently within our own Circuit.[51] Where there is no abuse of discretion, inherent in the responsibility of such officials, courts will not intervene to inquire as to the reasons why prosecution was instigated against some and not all, especially where no particular "class",

such as in Yick Wo v. Hopkins, supra, was involved. Again we note, as above, that the plaintiffs who were not reinstated were not members of a particular "class", as such.

No abuse of that discretion has been shown here. Those plaintiffs, whose expulsions have been upheld by us, clearly were justifiably expelled, and they cannot be heard to complain that the whole student body was not also expelled.

Accordingly, we find and hold that plaintiffs' first cause of action is wholly without merit.

B. In their second cause of action, plaintiffs contend that both the Grambling Disciplinary Committee and the State Board of Education were biased; therefore, plaintiffs did not receive a fair hearing.

While we do not agree with this allegation for the reasons already outlined, in our disposition of plaintiffs' first cause of action, we repeatedly have stated that the Grambling disciplinary hearing did not comply with Dixon v. Alabama State Board of Education and could not be

49. See Packers Hide Association v. N.L.R.B., 360 F.2d 59 (8th Cir. 1966) where union steward's discharge for instigating strike was upheld. Other strikers received less severe penalties; Harnischfeger Corp. v. N.L.R.B., 207 F.2d 575 (7th Cir. 1953) where three employees were discharged for "leading an illegal walk out."; Kraft Foods Co., 108 N.L.R.B. 1164 (1954), employee discharged for attempting to incite a strike; In re Stockham Pipe Fittings Co., 84 N.L.R.B. 629 (1949), leader of strike discharged; upheld despite allegations of discriminatory discharge; Complete Auto Transit, Inc., 134 N.L.R.B. 654 (1961) two employees discharged for instigation of illegal strike; Kohler Co., 46 L.R.R.M. 1389 (1960) recognized employer's right to select those to be discharged for participation in mass picketing.

50. 28 U.S.C. § 507(b). The Attorney General shall have supervision over all litigation to which the United States or any agency thereof is a party and shall direct all United States attorneys, assist-

ant United States attorneys, and attorneys appointed under section 503 of this title in the discharge of their respective duties.
La.C.Cr.P. art. 61. Subject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when and how he shall prosecute.

51. Smith v. United States, 375 F.2d 243 (5th Cir. 1967), in particular at p. 247 where some of the considerations in the exercise of the discretion granted to prosecuting attorneys is discussed; United States v. Cox, 342 F.2d 167 (5th Cir. 1965) which provides a historical review of the discretion given prosecuting attorneys. This topic also has been the subject of recent scholastic writing. Kaplan, The Prosecutorial Discretion—A Comment, 60 N.W.U.L.Rev. 174 (1965–66); Comment, The Right to Nondiscriminatory Enforcement of State Penal Laws, 61 Col.L.Rev. 1103 (1961).

deemed a constitutional "hearing" from a due process standpoint.

Plaintiffs allege that the Board's bias consisted of the following: (1) The Board refused to review the record of the proceedings at Grambling, in violation of state law; (2) the Board held a completely new hearing instead of merely reviewing the Grambling hearing which caused a financial hardship on the student-plaintiffs; (3) Grambling College denied one member of the faculty permission to attend the hearing while transporting some thirty others to the hearing; (4) members of the public were not allowed to attend; (5) counsel for the State Board acted in a dual capacity as prosecutor of the students and as advisor to the Board, and therefore unduly prejudiced the Board against the students.

■ As far as allegations (1) and (2) are concerned, counsel for plaintiffs have cited no requirement under state law, or from any other jurisdiction, which prohibits the Board from holding a hearing *de novo*, which indeed is much fairer than merely reviewing a "cold" record. Both sides were notified in advance that there would be a full evidentiary hearing and this hearing was scheduled at the request of plaintiffs, not by the College or the State Board of Education. Moreover, it seems incredibly inconsistent that plaintiffs could contend in one breath that they could not get a fair hearing at Grambling and in the next breath contend that a hearing *de novo* before the State Board was prejudicial to their case. We fail to see what could have been more fair and just than to allow plaintiffs the opportunity to present their entire case before a completely different body, which totally disregarded the admittedly "insufficient" hearing at the College. As we already have found, the hearing before the State Board was more than "fair," so as completely to comport with every aspect of Dixon v. Alabama State Board of Education. Accordingly, we find plaintiffs' allegations of bias in their contentions (1) and (2) to be totally without merit.

■ As noted, the third contention in this respect states that a member of the Grambling faculty was prohibited from attending the hearing in Baton Rouge, an allegation which was clearly refuted by President Jones when asked that specific question on cross-examination at the hearing before the State Board. (State Bd. p. 80).

■ The fact that "the public" was not allowed to attend the hearings before the State Board in no way tends to establish bias or unfairness in those proceedings. No citation of authority has been submitted, and indeed there is none, which necessitates a public hearing in such matters. Indeed for the benefit of the reputation of the students involved, where they were strongly represented by able counsel, and given the widest possible latitude, it would seem more fitting to allow all charges and defenses to be made before the Board itself, not as a "Star Chamber" proceeding, but in a genuine effort to protect the students against unwonted and probably inaccurate news media reporting.

■■ Fifth and finally, plaintiffs argue that counsel for the State Board acted both as prosecutor and as advisor to the Board and therefore the Board was prejudiced in its deliberations. Again, beyond that mere allegation, we fail to see the merit in that argument and find nothing in support of it. Plaintiffs had every opportunity to prove the bias of the Board at the hearing in Baton Rouge. There is no evidence to substantiate that claim, and, on the contrary, the Record requires a finding that the Board, almost overzealously, maintained the opposite attitude. As noted, the students themselves requested the hearing before the State Board.

In their hearing of this matter, the Board repeatedly acquiesced to requests of plaintiffs' counsel in such matters as

additional time to sum up each individual case; extreme latitude in examination of witnesses; and agreeing to hear each case on an individual basis instead of as a group.

 In holding that this contention is without merit we rule that such proceedings need not be held to the standards of a trial in a court of law. No evidence is in the Record that counsel for the Board exerted any biased influence upon the Board in its consideration of the matter. We must note that one of students' counsel conceded the fairness of this hearing and expressly commented on at least one favorable aspect.[52]

Pursuant to the foregoing findings and reasoning, we find plaintiffs' second cause of action to be without merit.

C. Plaintiffs' third and fourth causes of action may be considered together. Therein it is alleged that with respect to plaintiffs Brown, Caulfield, Clark, Duhon, Freeman, Jones, Marcelous, and Major, no evidence was presented at either hearing within the scope of the formal charges served on them by letter from the State Board dated November 20, 1967.

 With respect to plaintiffs Bullock, Caulfield, Duhon, Freeman, Jones, Major, Marcelous and Williams we made the following specific determination, in our decree of January 4, 1968:

IT IS FURTHER DETERMINED AND ADJUDGED that as to the re-

maining plaintiffs in this action, namely, Maurice Kenneth Major, Ernest Lee Caulfield, Larry James Bullock, Agnes M. Duhon, Kenneth Marcelous, Herman R. Freeman, Annette Jones, and Ann L. W. Williams, the defendants have not shown "unclean hands", in that the record does not establish that these plaintiffs blocked or participated in blocking the Administration Building at Grambling College on October 26 or 27, 1967 and as to these plaintiffs, IT IS ORDERED that the application for a temporary restraining order readmitting these plaintiffs as students in good standing in all respects be, and hereby is, granted. (This order is in the Record.)

Having ordered reinstatement of those eight plaintiffs, we now consider the cases of plaintiffs Armand, Brass, Brown, Casimere, Clark, Daggs, Ford, Giles, Hollins, Hudson, Kelly, Moore, McGhee, Mitchell, Lewis, Player, Webb, and Zanders.

We already have held, and plaintiffs' counsel (Tr. 225) conceded, that blocking the Administration Building clearly was not protected activity. The formal charge upon which expulsion of the remaining plaintiffs were denied relief in this Court was as follows:

"Organized and instructed groups of students to block the entries to the Administration Building for approxi-

---

**52.** During cross-examination the following dialogue transpired between Richard Sobol, counsel for plaintiffs and J. Marshall Brown, Chairman of the State Board of Education:

"THE CHAIR: I understand, and I'm bending over backwards to be fair to you.

MR. SOBOL: I know you are, and I appreciate that." (State Bd. pp. 447–448.)

Again, we note that counsel concedes that the Board was acting in good faith:

"MR. SOBOL: Well, the cases that the Board has seen are different. On some of them there is evidence; on some

of them there isn't. I think that's—I would like to emphasize and I think I—one of the good factors about this procedure is it does tend to emphasize that each of these students stand on their own footing * * *." (State Bd. pp. 245–246)

In passing we also note that counsel's objection to the size of the room and the fact that the public was not allowed to attend was apparently remedied by suggestion of counsel for plaintiffs. See State Bd. p. 7, where the Board granted counsel's motion for separate hearings of each student's case.

mately forty-eight hours, day and night, Thursday and Friday, October 26 and 27, 1967."

■ The complaint alleges that the latter named sudents were not expelled as a result of evidence within the scope of the formal charges. We have not been favored with a precise basis for this complaint, either in argument or in brief. Nevertheless, we assume that these plaintiffs, through counsel, make a distinction between "organized and instructed" and "participating" in blocking and massively sealing off of the Administration Building as the basis of their allegations. At best, this argument is insubstantial, in light of the Record, if indeed that is their legalistic contention. To that extent, Hammond v. South Carolina State College, 272 F.Supp. 947 (D.C., S.D.1967), cited by plaintiffs' counsel, is inapposite, because there a local college Rule attempted to proscribe "peaceable assembly," without permission of college authorities, and constituted an unconstitutional "prior restraint." [53] Here, the President of Grambling, Dr. Jones, expressly advised the students they were entitled to do this. (Tr. p. 113)

Rule 8 of the Federal Rules of Civil Procedure established a rather revolutionary "notice" type of pleading in Federal Courts. It provides: "All pleadings shall be so construed as to do substantial justice" (Rule 8(f)). This technical mode of construction, adopted by plaintiffs, is no more than a mere exercise in semantics, which met its demise with rejection of the common law "writ system" of pleading, which has been adopted universally. Individual analysis of the evidence presented against the latter-named plaintiffs now will be set forth.

From uncontroverted testimony by Collie Richardson, director of public rela-

---

**53.** It is interesting to note that Judge Hemphill in that case made the following comments:

"The controversy here revolves around the school rules of deportment and discipline. Their obvious purpose is to protect the authority and administrative responsibility which is imposed on the officers of the institution. Unless the officials have authority to keep order, they have no power to guarantee education. If they cannot preserve order by rule and regulation, and insist on obedience to those rules, they will be helpless in the face of the mob, powerless to command or rebuke the fanatic, the irritant, the malingerer, the rabble rouser. To be sure, this is a tax supported institution, but this does not give license to chaos, or the hope to create chaos. The majority of the taxpayers who established, through representative government, the institution, and all the taxpayers who support this institution, have a vested interest in a peaceful campus, an academic climate of order and culture. The power of the president to oversee, to rule, is an integral part of the mechanism for providing and promoting education at State College. Be that as it may, colleges, like all other institutions, are subject to the Constitution. Academic progress and academic freedom demand their share of Constitutional protection. Here we find a clash between the Rules of the school and the First Amendment to the Constitution of the United States.

"The First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press. It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow.' Bridges v. State of California, 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192, Schneider v. State [of New Jersey], 308 U.S. 147. These rights of the First Amendment, including the right to peaceably assemble, are not to be restricted except upon the showing of a clear and present danger, of riot, disorder, or immediate threat to public safety, peace, or order. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, Cantwell v. State of Connecticut, 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213]. 'Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation.' Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430. Conduct which involves activities such as picketing and marching, however, are a departure from the exercise of the rights in pristine form and they do not receive the same degree of freedom. Cox v. State of Louisiana, 379 U.S. 536, 85 S. Ct. 453, 13 L.Ed.2d 471. * * *" (272 F.Supp. pp. 947, 949–950.)

tions at Grambling College, it clearly was established that student-plaintiff Edward Brown gave instructions concerning the blocking of the Administration Building (State Bd. p. 225). There was no evidence to the contrary.

Student-plaintiff Gardner Clark admitted blocking the Administration Building and also admitted the effectiveness of that blocking (State Bd. pp. 290–291; Tr. p. 188).

Leroy Hawthorne, acting Dean of Men at Grambling, testified that he actually saw plaintiff Cleveland Ford blocking the entrance to the Administration or Academic Buildings (State Bd. p. 360). This testimony was uncontradicted.

Dean Hawthorne also identified plaintiff Joseph Giles as among those blocking the Administration Building (State Bd. p. 380). Again this evidence is uncontradicted.

President R. W. E. Jones identified plaintiff Rudell Hudson, who voluntarily and unofficially withdrew as a student (Tr. 52), as a participant in blocking the Administration Building (State Bd. p. 413), and Dean E. L. Cole also testified that he personally saw Hudson standing in front of the Administration Building (State Bd. p. 442). This testimony is uncontradicted.

Dr. William McIntosh, dean of the Liberal Arts Division at the College, testified that he observed student-plaintiff Patrick Kelly in front of the Academic Building and personally asked Kelly to use his influence to persuade the students to move but Kelly ignored him (State Bd. pp. 466–467). This testimony likewise is uncontradicted.

Clyde Wilson, a counselor at the College, testified that he personally observed student-plaintiff Paul McGhee blocking

the entrance to the Administration Building (State Bd. p. 499). This testimony is uncontradicted.

Student-plaintiff Anthony Mitchell was identified as one of those blocking the Academic Building by Clyde Wilson, whose testimony is uncontroverted (State Bd. p. 516).

Counselor Clyde Wilson unequivocally testified that student-plaintiff Charles Webb blocked the Administration Building, and Mr. Wilson stated that he personally observed this illegal activity (State Bd. pp. 534–536). Again, this testimony was uncontradicted.

As to plaintiffs Armand, Brass, Casimire, Daggs, Moore, Lewis, and Zanders, it was stipulated that they participated in, or instigated, the blockade (Tr. 238).

Having disposed individually of the cases of eighteen of the twenty-six plaintiffs involved in this action as to whom we denied issuance of a Temporary Restraining Order, (and, in effect, their application for a temporary and permanent injunction, Rule 65(a) (1)), for purposes of demonstration that this Court, as did the State Board, "leaned over backwards" in its rulings, we now set forth references to the Record which clearly establish a logical constitutional basis for expulsion of the remaining eight plaintiffs, namely, Kenneth Armand, Bennie Brass, Clifton Casimire, Gale Jean Daggs, Walter Hollins, Cleveland Moore, Claude Anthony Lewis and Willie Zanders.[54] As noted in our ruling, out of perhaps an overweening sympathy for their misguided conduct, we granted eight of the plaintiffs' applications for an order of reinstatement, which, by agreement, has been continued indefinitely (Tr. 251).

It was stipulated (Tr. 238, et seq.) that all of the plaintiffs except the eight named for reinstatement (See Decree of

---

54. All references to the Record designated "Tr." (standing for pages of the transcript compiled in this Court); others are to the hearing before the State Board of Education ("State Bd. ——").

Kenneth Armand (pp. 147, 153); Bennie Brass (pp. 175, 181, 184); Clifton Casimire (p. 258); Gale Jean Daggs (p. 319, this evidence was by affidavit; see also Tr. 220–221); Walter Hollins (p. 387); Cleveland Moore (pp. 520, 521; see also Tr. pp. 153–154); Claude Anthony Lewis (p. 478); Willie Zanders (pp. 553, 565).

January 4, 1968, and Tr. p. 250) had engaged in constitutionally unprotected activity (Tr. 238, et seq.). Therefore, plaintiffs' third and fourth causes of action are found to be completely without merit.

D. For the ample reasons heretofore enunciated, we find plaintiffs' fifth cause of action, which is that those plaintiffs not reinstated used justifiable means of expressing their "grievances," also is without merit and it clearly is insupportable.

## VI. EQUITY—"UNCLEAN HANDS" DOCTRINE

Regarding the nominal basis upon which this case was tried, it recently has been said that:

"The familiar principle that 'he who comes into a court of equity must come with clean hands' would not necessarily bar a person seeking to enjoin discriminatory enforcement of a criminal statute. Generally, neither the federal nor state courts have disposed of suits to enjoin criminal prosecutions for reasons other than discriminatory enforcement on this ground. Rather, they rely on the test of threatened irreparable injury. The failure to consider the clean hands doctrine in such cases is, of course, of limited significance, since virtually all of them involve challenges to the constitutionality of the statute under which prosecution is threatened; in such a situation, if a petitioner's claim has merit the statute is invalid and his hands are clean. On the other hand, when petitioner does not challenge the constitutionality of the statute but merely claims discriminatory enforcement as the basis for injunctive relief, establishing the validity of his claim will not purge the illegality of his act * * *

"Nevertheless, there appears to be [an applicable] principle limiting the clean hands doctrine that may make it inapplicable to petitioners seeking to enjoin discriminatory enforcement; the rule that petitioner's misconduct, to ground a defense of unclean hands, must have substantially affected the relationship of the * * * parties to the litigation, and must have arisen *out of the subject matter of the litigation and not some collateral matter * * *"* [55] (Emphasis supplied).

At the very beginning of these proceedings, we said:

"Let the record show that this hearing is primarily to determine whether the named plaintiffs are entitled to equitable relief by way of a temporary restraining order, which has been opposed by the defendants, on the grounds that they have come into Court with unclean hands, and, therefore, are not entitled to invoke the equity powers of the Court to grant a restraining order or injunction, either preliminary or permanent.

"If other matters are to be pried into by counsel, as we told [them] in Chambers a few moments ago, that may be done * * *." (Tr. pp. 2, 3).

We make the above references because plaintiffs' counsel repeatedly have urged that the doctrine of "unclean hands" was not applicable where serious questions concerning constitutional rights were presented for consideration.

Notwithstanding our statement with reference to the issue of "unclean hands," the proceedings which took place in the hearing before this Court eventually developed into a full evidentiary exposition upon the merits of the action brought by the various student-plaintiffs. This is clearly evidenced by the wide range of examination allowed to counsel for plaintiffs, as shown by the Transcript as a whole, and by their documented admission in the Court of Appeals that:

"[t]he temporary restraining order, [which] was refused only after a two day evidentiary hearing on nineteen

55. Comment, The Right to Nondiscriminatory Enforcement of State Penal Laws, 61 Col.L. Rev. 1103, 1139 (1961).

days' notice at which both sides presented witnesses, as well as legal argument. Although denominated a hearing on plaintiffs' application for a temporary restraining order, it was, in all practical respects, a hearing and determination of plaintiffs' motion for a preliminary injunction." [56]

In a word, plaintiffs' expulsions were not upheld by this Court on the mere ground that they had "unclean hands," but rather on the fundamental proposition that there was a highly reasonable and just basis for their expulsions due to proven illegal conduct on their part, which had been established clearly at a fair and impartial hearing before the State Board of Education,[57] and which was re-established before this Court.

The United States Supreme Court has reversed numerous convictions where discriminatory selection of jurors, violative of the "equal protection" clause of the Fourteenth Amendment, clearly has been shown.[58] Nevertheless, the Court in those cases clearly appears to have measured the sufficiency of such evidence by considering whether it reasonably could be explained only by intentional discriminatory selection; and proof of another reasonable explanation of selection was held to be sufficient to refute the inference of discrimination.[59]

■ Applying this analysis to this case, we conclude that, while plaintiffs have alleged discriminatory selection and partiality in the action of their "judges" on the State Board, they totally have failed to prove such discrimination, and the Record clearly reveals a most adequate basis for their expulsions, which, as noted, virtually has been conceded by plaintiffs. Thus we must rule that the doctrine of "unclean hands" was not applied discriminatorily to deny plaintiffs a fair hearing in order to determine the validity of their expulsions.

The transcript of the proceedings before this Court speaks for itself. Plaintiffs were afforded full opportunity to show that their expulsions were unjustified and they failed utterly to prove those allegations.[60]

For these reasons, therefore, our order of January 4, 1968, must be allowed to stand.

---

56. See Plaintiffs' Motion for Injunctive Relief Pending Appeal, p. 6. Under Docket No. 25637 in the Fifth Circuit Court of Appeals; Motion denied January 17, 1968, and motion for rehearing, and for rehearing en banc, denied February 2, 1968.

57. In this regard we note the stipulation of plaintiffs' counsel:
"MR. SOBOL: We will have three or four short witnesses on the clean hands issue.
I would like to offer the following stipulation for the convenience of the Court and the parties: That anything said by anyone in Baton Rouge we will stipulate would be received here and we certainly don't ask for the formality of witnesses who were in Baton Rouge and cross examined by us to get on the stand and repeat it.

We will request the Court to rely on the statements made by witnesses in Court this morning." (Tr. 187, 188)

58. For example see Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Hill v. State of Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L. Ed. 84 (1940); Pierre v. State of Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L. Ed. 757 (1939).

59. See Comment, 61 Col.L.Rev. 1103, supra, at page 1122, et seq.

60. We acknowledge, with much gratitude, the able and extensive research done by our Law Clerk, Mr. Robert A. Seale, Jr., B.A., '64, J.D., '67, Louisiana State University.