Allen F. BARKER, Donald Steven Hill, Thomas Malone, Terry Miller, Charles E. Newbold, Carmen Pilgrim, Alonzo Saunders, Albert Smith, Sharon Maria Smith, and Alan Scott Tucker, Individually and in Behalf of all those similarly situated, Plaintiffs,

v.

Wendell G. HARDWAY, President of Bluefield State College; J. I. Turner, Dean of Men of Bluefield State College; Wanda Moore, Dean of Women of Bluefield State College; and West Virginia State Board of Education, a Public Body Corporate, Defendants.

Civ. A. No. 1037.

United States District Court
S. D. West Virginia,
Bluefield Division.

April 10, 1968.

Herbert H. Henderson, Huntington, W. Va., Lewis M. Steel, New York City, for plaintiffs.

Jerome Katz, Katz, Katz & Kantor, Bluefield, W. Va., Leo Catsonis, Asst. Atty. Gen., State of West Virginia, Charleston, W. Va., for defendants.

CHRISTIE, District Judge:

. STATEMENT OF THE CASE

On October 26, 1967, the plaintiffs, suspended students at Bluefield State College, filed a verified complaint in this court seeking to enjoin the defendants from continuing to enforce their suspension. As is here pertinent, the complaint alleged that since the beginning of the September 1967 term, the plaintiffs and other students had conducted peaceful and non-violent protests, and that on October 14, 1967, approximately two hundred students participated in such a demonstration at the college football field to protest the alleged racially discriminatory practices of the college administration and for the alleged denial of First Amendment rights. Plaintiffs further alleged that they were suspended without notice of hearing and for the sole purpose of stifling peaceful protest activities of students at Bluefield State College in violation of their First and Fourteenth Amendment rights.

The defendants, by answer, denied that all the assemblages occurring since

September 1967 were peaceful and non-violent, and alleged that several such demonstrations had been violent in nature and resulted in loss of property and personal injury and had seriously hampered, impeded and disrupted the functioning of the college. Specifically, defendants alleged that the October 14 demonstration became violent and involved attempts to do bodily harm to defendant Hardway and others, necessitating active police participation. Defendants further alleged that the suspension procedure utilized was justified as essential to the safety and welfare of the entire student body, faculty and property and the orderly operation of the college; that the letters of suspension were the only means of notification available, inasmuch as all efforts to contact plaintiffs were frustrated by their elusive conduct.

By stipulation and Order entered on January 2, 1968, the following issues were formulated:

I

Whether the plaintiffs did, singly or in combination, or in concert with others, overtly engage in, or encourage or incite others to engage in, a non-peaceful or violent protest or demonstration at Mitchell Field Stadium on October 14, 1967, and if so, whether the degree of their activity or participation at or preceding such demonstration was such as to call for disciplinary action by the school administration, and if so, what?

II

Whether those affected were given an opportunity to be heard before or after their suspensions, and if so, whether the procedures followed were adequate to meet the requirements of federal due process.

III

What rules and regulations, if any, were promulgated for the government of the student body, on and off campus; when they became effective; what notice or publication thereof was given the student body; and whether they, by their terms, applied equally to both whites and Negroes, and whether they were administered and enforced by the school administrators as between whites and Negroes.

IV

Whether the defendants, or any of them, took any actions during the year 1967 which denied plaintiffs their First Amendment rights to freedom of speech, assembly and petition for redress of grievances.

An evidentiary hearing on these issues commenced on January 2, 1968, and was concluded on January 12, 1968. Decision was deferred pending preparation of a transcript of the evidence and the submission of briefs.

FINDINGS OF FACT

I

A. Plaintiffs were students at Bluefield State College, a state-supported institution of higher learning, located in Bluefield, West Virginia. It is operated by, and is under the "control, supervision and management" of the West Virginia Board of Education.[1] Rule making authority is vested in the president and faculty subject to the approval of the board.[2] The college was originally established and operated as an all-Negro institution, but was desegregated soon after the 1954 Supreme Court school integration decision. Present school enrollment is 1530, of which approximately 60% is white and 40% is Negro. Student financial aid is distributed on the basis of 76% to Negro students to 24% to white students.

B. Alonzo Saunders, one of the plaintiffs and a leader in the student rights movement at the college, planned a student protest demonstration which was to begin during the half time of the homecoming football game at Mitchell Field Stadium on October 14, 1967.

C. The ostensible purpose of the student protest demonstration was to en-

1. W.Va.Code, 18–2–13

2. W.Va.Code, 18–14–1

courage Dr. Hardway, President of Bluefield State College, to grant the students more freedom and a greater voice in the administration of the college. However, it, in reality, culminated into an effort to embarrass, intimidate and denounce Dr. Hardway and Dean of Women Wanda Moore, two of the defendants.

D. Approximately two hundred students, the majority of whom were Negroes, demonstrated at half time by marching back and forth on the playing field, carrying placards and chanting themes denouncing Dr. Hardway and Dean Moore. That the half time demonstration which was conducted on the playing field was peaceful and non-violent is undisputed. We are primarily here concerned with what ensued thereafter.

E. Subsequent to the half time and after the game had resumed, the student demonstrators moved into the home stands and unsuccessfully attempted to persuade a group of white fraternity members to join in the protest. The demonstrators then moved to the section of the bleachers where Dr. Hardway, Mrs. Hardway and their guests, Dean Moore, Mr. Moore, several other members of the college staff and other spectators were seated, and continued to demonstrate by displaying their placards and chanting themes as they had done during the half time. They encircled the section in which Dr. Hardway and his guests were seated and deliberately obscured their view of the football game by holding a placard directly in front of their faces. Several of the faculty members and other spectators felt compelled to leave the game as the actions of the demonstrators became more harassing and menacing. Thereupon, the police, deeming it expedient to do so, escorted Dr. Hardway and Mrs. Hardway and the latter's father and mother from the stands. Mrs. Hardway and her mother left the stadium and the police escorted Dr. Hardway and his father-in-law across the end of the field to the visitors' side which was then virtually unoccupied.

F. While this was being done, one of the demonstrators spat into the face of one of the police officers; another, Albert Smith, called out, "Hardway, we're going to get you."

G. Soon after Dr. Hardway and his guest had taken their seats in the stands on the visitors' side, the demonstrators marched over and continued in their menacing conduct. With the exception of Donald Hill and Alan Tucker, all of the suspended students were identified as being active participants in the events on the visitors' side. Hill was identified as one of the demonstrators whose conduct on the home side prompted the police to escort Dr. Hardway and his guests from that side of the field.

H. On the visitors' side, Alonzo Saunders, Charles Newbold, Carmen Pilgrim, Sharon Smith, Thomas Malone, Allen Barker and Terry Miller were specifically identified as being among those urging that they charge the police officers who stood between them and Dr. Hardway. Shouts of "Put the girls up front, they won't hit them" were heard. The demonstrators eventually entered the stands where Dr. Hardway was seated, forcing the police officers to form a protective circle around him and to escort him entirely from the stadium. Alonzo Saunders was identified as the general in charge of this shameful episode. The demonstrators threw rocks and bottles as they left the stadium. One police officer was struck in the back by a rock. One demonstrator attempted to reach through the police circle and grab or strike Dr. Hardway.

I. The demonstrators followed Dr. Hardway and the police officers to the parking lot where his automobile was parked and attempted to prevent his leaving. An automobile was driven in front of Dr. Hardway's to block its exit. The police had to force the driver to move. The demonstrators beat upon and rocked Dr. Hardway's automobile. One police officer was struck in the face by a rock, another was struck in the face by a demonstrator.

J. After the police provided for Dr. Hardway's exit, they had to form a defensive line to protect themselves from the demonstrators. The police officers, while being verbally and physically abused, were forced to back from the parking lot into the stadium.

K. Dr. Hardway was personally able to identify Allen F. Barker, Donald Steven Hill, Thomas Malone, Terry Miller, Charles Newbold, Carmen Pilgrim, Alonzo Saunders, Albert Smith and Sharon Maria Smith as nine members of the student demonstrators, either leaders or active participants in the demonstration that took place at the stadium after the half time. Some of these were also identified by the police officers. One, Terry Miller, was identified by a police officer, Sergeant Dalton, as a participant in the melee on the parking lot.

L. Approximately three hundred students engaged in a "sing in" on Dr. Hardway's lawn, located on the college campus, at about 12:30 A.M., October 16, 1967. The "songs" were of the same chants that had been used during the demonstrations on October 14. Dr. Hardway remained inside and observed Alan Tucker as the leader of the "sing in."

■ It is, therefore, specifically found as a matter of fact that all the suspended students except Alan Tucker did, following the football game half time, engage in, and encourage others to engage in, a non-peaceful and violent protest demonstration at Mitchell Field Stadium on October 14, 1967, which posed an imminent threat of danger to Dr. Hardway and others in lawful attendance at the game, in violation of the rules and regulations of the Bluefield State College, and that the degree of their activity and participation therein was such as to call for the invocation of disciplinary action against them by the school administration pursuant to such rules and regulations.

■ It is further found as a fact that while Alan Tucker, the other sus-

pended student, was the leader of the "sing in" after midnight, to-wit, at about 12:30 A.M., October 16, 1967, on Dr. Hardway's lawn, located on the college campus, the exercise itself was unaccompanied by any violent or non-peaceful activity, and though it was obviously designed to further harass and annoy Dr. Hardway and was in violation of the rules of the school, it may have been permissible under the First Amendment. Tucker is given the benefit of the doubt and exonerated of blame for this incident as a matter of fact.

II

A. On Monday, October 16, 1967, prior to taking any action against the nine students identified as participants in the demonstration after half time at the homecoming football game and the one who had led the "sing in" previously mentioned, Dr. Hardway sent Dean of Men Joseph I. Turner and Dean of Women Wanda Moore to contact each and request them to come to his office. They were unable to locate any of the ten students in their scheduled classes or at their record places of residence. Dean Turner later found four of the male students participating in another demonstration on the campus and requested each of them to go to Dr. Hardway's office. Each refused.

B. Being unable to get the ten students to come to his office, Dr. Hardway mailed suspension letters to each and notified their parents by telegram. The ten students were advised in the letters of the reason for the action, that they could have an appeal hearing before the Faculty Committee on Student Affairs, and how to request one.

C. Each of the ten suspended students formally requested a hearing before the Faculty Committee on Student Affairs.

D. The Committee notified each of the students of the specific charges against them, the procedures to be followed and the date and time for the hearing.

E. Six of the suspended students [3] appeared before the Committee and upon having their requests to be represented by legal counsel refused, read a prepared statement and refused to go on with the hearing.

F. Four of the suspended students [4] appeared and had a hearing. The Committee recommended reinstatement for two [5] and they were reinstated on January 2, 1968. The other two suspensions remain in force. Thus, Dr. Hardway accepted the recommendations of the Committee in each instance.

G. The Committee extended further opportunities for a hearing to the six students who refused. Two other hearing dates were set for each of the six. None appeared for a hearing at any of the designated times.

H. Bluefield State College procedures in effect on October 14, 1967 provide that any student subject to disciplinary action may appear before the Dean of Men, Dean of Women, Faculty Committee on Student Affairs or the President upon request. When the Faculty Committee on Student Affairs is to consider a problem in which a student is involved, the student is notified of the specific charge against him; that he may bring with him to the hearing as an advisor a faculty member, a fellow student or his parents; that he may face his accuser; that he may produce witnesses; and the date and time set for the hearing.

I. The Committee consists of six faculty members, viz.: Dr. Cortez D. Reece (Negro), Mrs. Othello Jefferson (Negro), Mr. Randolph White (white), Mrs. Rita Hill (white), Miss Doris Rice (Negro) and Mr. Donald Craft (white). Thus, the composition of the Committee with reference to race is equally divided. Mr. Craft is its chairman.

■ It is, therefore, specifically found as a matter of fact that the plaintiffs were duly notified of their suspensions, the reasons therefor and were given an opportunity to be heard. Whether the procedures provided and followed were adequate to meet the requirements of due process is a question of law and it is dealt with elsewhere herein.

III

A. Dr. Hardway's administration began in July of 1966. A student handbook had not been printed for the academic years 1964–65 and 1965–66. Early in his tenure, Dr. Hardway assigned to Dr. S. E. Cary, Director of Guidance, the task of preparing a current student handbook which was to include, *inter alia,* disciplinary procedures. After Dr. Cary completed the task, it was sent to the printer early during the summer of 1967, but the printed copies were not delivered to the college until sometime during the first week of October 1967. They were immediately distributed to the student body. This handbook is identified in the record as "Plaintiffs' Exhibit B."

B. The handbook also sets forth the right of students to assemble, discuss, debate and to disseminate personal and group opinion; the right to initiate and conduct organizations and programs consistent with the institutional program of higher education and college policy and the right to use college facilities in accordance with college regulations. Also included is a code of conduct.

C. With the exception of the disciplinary procedures, the other matters set forth in the student handbook are essentially the same as contained in similar handbooks of prior years. Furthermore, the procedures were given by the Faculty Committee on Student Affairs to each and every student against whom disciplinary action was taken.

■ It is, therefore, specifically found as a matter of fact that the handbook identified as "Plaintiffs' Exhibit B" was in effect and was distributed to the student body prior to October 14, 1967;

---

3. Charles Newbold, Thomas Malone, Terry Miller, Sharon Smith, Carmen Pilgrim and Alonzo Saunders.

4. Albert Smith, Allen Barker, Donald Hill and Alan Tucker.

5. Alan Tucker and Donald Hill.

that the rules, regulations and disciplinary procedures contained therein, by their terms, applied to all students equally; and that there was no discrimination proven against the school administration in the manner of their application and enforcement as between students or as between races.

## IV

■ The record fails to disclose any preconceived policy or design by the West Virginia Board of Education or the administrative or faculty staff of the college to restrict or deny the plaintiffs or others similarly situated of their First Amendment rights, or any specific instance where any of the defendants attempted to do so. The numerous attempts by the defendants and other school administrators to establish communications with the student body and appeals for a list of grievances, the apparent recognition of the *de facto* Students Rights Committee, the numerous demonstrations on campus such as the student union sit in and the student demonstration while Arter Hall burned, all attest to the administration's desire to encourage rather than deny or restrict the students in the exercise of their lawful rights.

It is, therefore, found as a matter of fact that none of the defendants took any action during the year 1967 which denied, or had the effect of denying, plaintiffs any of their First Amendment rights to freedom of speech, peaceful assembly, or petition for redress of grievances.

## DISCUSSION AND CONCLUSIONS OF LAW

### I

■■ The statement of general policies and regulations contained in the student handbook requires decorous, sober and upright conduct of every student both on and off the campus. It further interdicts conduct which fails to show respect for good order, moral actions, personal integrity, rights of others, or for the care of property, and provides for disciplinary action against the offender. These are reasonable rules and generally recognized as necessary to orderly administration of schools and colleges. Their obvious purpose is twofold: (a) to protect the authority and administrative responsibility which is imposed on the officers of the institution, and (b) to provide a suitable climate to students for study and relaxation. Unless these officials have authority to keep order, they have no power to guarantee education. The power of the president of the college to oversee, to formulate rules and regulations, and to rule is a necessary element in order to provide and promote education. Hammond v. South Carolina State College, 272 F.Supp. 947 (D.C. S.C.1967). In West Virginia, such power is specifically delegated by the Board of Education to the president and faculty. Moreover, these officials have an inherent general power to maintain order and exclude those who are detrimental to the student body and institution's well-being, so long as they exercise sound discretion and do not act arbitrarily or capriciously. Buttny v. Smiley, 281 F.Supp. 280 (D. Colo.1968); Zanders v. La. State Board of Education, 281 F.Supp. 747 (D.C. W.D.La.1968); Goldberg v. Regents, 57 Cal.Rptr. 463, 473 (Ct.App. 1st Dist. 1967).

■ Consequently, the judiciary must exercise restraint in questioning the wisdom of specific rules or the manner of their application, since such matters are ordinarily the prerogative of school administrators rather than the courts. Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966); Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966); Due v. Florida A & M University, 233 F.Supp. 396, 403 (N.D. Fla.1963); 47 Am.Jur. (Schools) Sec. 178, p. 430.

■ It is concluded as a matter of law that the described acts and conduct of the identified plaintiffs at Mitchell Field Stadium on October 14, 1967, far exceeded the bounds of a peaceful demonstra-

tion or protest for the correction of grievances; that the same were in clear violation of the rules and regulations of Bluefield State College, and that it, therefore, became and was the duty of the administrative authority of the college to take appropriate action and to invoke available disciplinary procedures then in effect against those responsible. Having so concluded, Dr. Hardway's action in issuing the suspension orders, with the right to the parties to appeal to the Faculty Committee on Student Affairs, was clearly within the recognized limits of his authority as the administrative head of the college. There thus being no abuse of discretion on his part in so doing, this Court is without authority to interfere. Buttny v. Smiley, supra; Zanders v. La. State Board of Education, supra; Goldberg v. Regents, supra. °

We now reach the question of whether the appeal and hearing procedures provided and utilized were adequate to meet the requirements of due process of law.

## II

Whatever the law might previously have been on the subject, the rule announced by the Fifth Circuit in Dixon v. Alabama Board of Education, 294 F.2d 150, cert. denied 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), that due process under the Fourteenth Amendment requires notice and opportunity for a hearing before a student at a tax-supported college can be expelled for misconduct and prescribing minimum procedural guidelines to be followed thereat, has since been generally accepted as correct by other courts. But the Court was most careful to note that its action in extending the aggrieved students the right to a hearing in that case was not to "imply that a full-dress judicial hearing, with the right to cross-examine witnesses," was contemplated, and in a further effort to avoid any possible misunderstanding of its ruling in this regard it went on to specifically and expressly limit and restrict the hearing procedure to one of a non-adversary nature. In so doing, it by appropriate language recognized the

practical difficulties and detrimental effect a broader application of the rule would have upon the institution and students alike. I find no basis for disagreement with that ruling or its rationalization.

■ As has been shown in the findings of fact, after receiving their notices of suspension from Dr. Hardway, each of the ten students requested a hearing before the Faculty Committee on Student Affairs and after the Committee had notified each of the specific charges, the procedure to be followed and the date and time for the hearing, four appeared and received hearings. The other six appeared but refused to submit to hearings unless represented by counsel. Their requests for counsel being refused, no hearings were held. Thereafter, on two separate occasions, the Committee extended further opportunities for hearings to the six students but none appeared.

■ They cannot base their refusal to submit to a hearing upon the failure of the procedure utilized to comply with any state statute on the subject for there was none in effect at the time. Instead, they seek to find justification for their refusal in the due process clause of the Fourteenth Amendment. What is required to meet procedural due process there appears to be controlled by the circumstances of each case. As was observed by Mr. Chief Justice Warren in Hannah v. Larche, 363 U.S. 420, at 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307, "'due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts." It thus has no universal application to all situations and, as the Chief Justice further pointed out, it has "traditionally been associated with the *judicial* process" (emphasis added), and whether it "requires that a particular right obtain in a specific proceeding depends upon a complexity of factors." Obviously the Committee here had none of the attributes of a judicial body, since its only function was to gather information and make recommendations which

had no binding effect on the president and faculty or on the Board of Education. It was not represented by counsel.

■■■■■ *Dixon* was explicit, as previously noted, in pointing out that a student disciplinary hearing need not be a full-dress judicial hearing and interpretations thereof have also clearly negated such a concept. Due v. Florida A & M University, supra; Wasson v. Trowbridge, 382 F.2d 807 (2d Cir. 1967); Madera v. Board of Education, 386 F.2d 778 (2d Cir. 1967); Zanders v. La. State Board of Education, supra; Cornette v. Aldridge, 408 S.W.2d 935 (Tex.Civ. App.). And, as was pointed out in *Madera*, the right to counsel is not an essential ingredient to a fair hearing in all types of proceedings, citing as authority for the statement Mr. Justice Frankfurter's concurring opinion in re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376, where he commented,

"＊ ＊ ＊ The utmost devotion to one's profession and the fullest recognition of the great role of lawyers in the evolution of a free society cannot lead one to erect as a constitutional principle that no administrative inquiry can be had *in camera* unless a lawyer be allowed to attend."

Thus the touchstones of the application of due process are reasonableness and fairness in view of all the facts and circumstances of the particular case. Due v. Florida A & M University, supra; Hannah v. Larche, supra. And it may be noted in passing that the law indulges the presumption that school authorities act reasonably and fairly and in good faith in exercising the authority with which it clothes them, and casts the burden on him who calls their conduct into question to show that they have not been actuated by proper motives. 47 Am.Jur. 2d (Schools) Sec. 188, p. 435.

■■■■■ While it is true that Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 in re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) and Mempa v. Rhay, 389 U.S. 128, 88 S.Ct.

254, 19 L.Ed.2d 336 (1967), have expanded the Sixth Amendment's guarantee of right to counsel in criminal and semi-criminal cases, all involving the right of liberty, they have no application to matters purely of a civil nature, and some of the cases cited by counsel for the plaintiffs are not in point for that reason. It must be kept in mind that this is a civil proceeding and unless the right in such a proceeding can be read into the due process clause of the Fourteenth Amendment or found in some Act of Congress or administrative rule or regulation, it does not exist. Suess v. Pugh, 245 F.Supp. 661 (N.D.W.Va.1965); Spears v. United States, 266 F.Supp. 22 (S.D. W.Va.1967). I have been cited to no decision by the Supreme Court or any other court expressly extending the right of counsel to a student at a school disciplinary hearing and my own extensive research has failed to reveal one. *Dixon* significantly failed to include it as a required safeguard in its enumeration of recommended minimum requirements; *Wasson* expressly declined to grant it under the facts and circumstances of that case. *Madera* and *Zanders,* although envisioning possible situations where the right might be required, avoided a definitive ruling on the point. There is a well-recognized rule of construction that where reasonable doubt exists as to the meaning of any law, or the relief sought is questionable, courts must act in view of their foresight of consequences. Thus courts must carefully determine and balance the nature of the private interest affected against the public interest involved, and this rationalization has undoubtedly influenced the judiciary in its reluctance to grant adversary judicial status to student disciplinary hearings. I share that reluctance. See 58 A.L.R.2d (Annotation) Sec. 4, pp. 909–12.

I conclude, therefore, that in the circumstances of this case, the Committee did not deny the six aggrieved students due process by refusing their request for counsel. And this is true for still another reason. The Supreme Court rec-

ognized in Hannah v. Larche, supra, a case dealing with the validity of certain rules of procedure adopted by the Commission on Civil Rights forbidding the presence of counsel, that the determinative factor there was whether the proceeding was "investigative" or "adjudicative." If investigative only, the right does not obtain; if adjudicative, it does. Applying this criterion to the facts of the instant case, it is clear the aggrieved students were not entitled to counsel before the Faculty Committee on Student Affairs, since it unmistakably appears from the evidence and the handbook that its only function was to gather facts and make recommendations to the president and faculty who could accept or reject them as they might choose. The adjudicative authority at the college rested at all times with the president and faculty and was never delegated to the Committee, as indeed it could not lawfully have been under state law.

Needless to say, the disposition thus made of the question does not mean that the six students are remediless in the premises. It simply means that in the circumstances of the case, they were not and are not entitled to legal representation before the Faculty Committee on Student Affairs by reason of the due process clause of the Fourteenth Amendment. If they be advised by their counsel that the college administrators have abused their discretion or have acted arbitrarily or capriciously, which in the context of the due process clause I do not find to be the case, they may relitigate the issue by way of mandamus in an independent action where all the rights and privileges of a litigant in an adversary judicial proceeding, including the right of legal representation, would be judicially afforded to both sides. This is the proper procedure to be followed in seeking relief for abuse of ministerial power or for arbitrary and capricious conduct of school officials. 12 M. J. (Mandamus) Sec. 14, p. 357; 47 Am.Jur. (Schools) Sec. 187, pp. 433–5;. 58 A.L.R. 2d (Annotation) Sec. 4, pp. 909–12.

## III

Having found no evidence in the record that the rules and regulations were not applied equally to both whites and Negroes at Bluefield State College by the school administrators, it is concluded as a matter of law that the plaintiffs have failed to sustain the burden of proof on the allegation of racial discrimination.

## IV

True it is that enrollment in school does not mean the student surrenders any of his constitutional rights. But by the same token, that fact does not give him the right to abuse and harass the administrators of the institution or engage in conduct detrimental to its well-being or which may tend to deprive other students of the right to a peaceful atmosphere in which to pursue their ambition for an education. Nor can it be gainsaid that the plaintiffs and their fellow demonstrators had the right under the First Amendment to bring their grievances to the attention of Dr. Hardway and other college officials in attendance at the football game, though a more appropriate time and place could very well have been chosen, and the evidence is uncontradicted that they were permitted to freely exercise this right by marching, chanting, singing and displaying signs and placards on and around the field throughout the half time; but when they entered the stands when the game resumed and by abusive and disorderly acts and conduct, first on the home side and then on the visitors' side, deprived Dr. Hardway and others in lawful attendance of the right to see and enjoy the game in peace and with safety to themselves, they thereby exceeded this constitutional privilege and forfeited its protection. I have failed to find any case saying that the right of free speech and peaceful assembly carries with it the right to verbally abuse another or to threaten him with physical harm or to deprive him of his right to enjoy his lawful pursuits.

As was pointed out in Baines v. City of Danville, 337 F.2d 579 (4th Cir. 1964), a case dealing with racial demon-

strations, First Amendment rights "are not a license to trample upon the rights of others. They must be exercised responsibly and without depriving others of their rights, the enjoyment of which is equally precious."

The acts and conduct of the demonstrators after the game resumed at half time were clearly non-peaceful and Dr. Hardway was fully within his rights in citing those he could identify for disciplinary action. In doing so, he did not violate any of their First Amendment rights.

■ The other incidents relied upon for First Amendment infraction were the deprivation of Robert Hayes to the use of the facilities of Payne Hall for approximately one month as a result of his living in the men's dormitory without registering or paying fees, contrary to the rules of the school; the attempt to deprive Florence Robinson of student financial aid on the charge that she misgraded another student's paper, and placing Carolyn Bratton, an off-campus student, on social probation (taking away her campus privileges except to attend classes), as defined in the student handbook. A careful examination of the evidence bearing on each of these incidents convinces me that the facts justified the action taken and that in each instance the action taken was clearly within the discretionary authority of the school administration. Furthermore, I find no support in the evidence to sustain the allegation of violation of First Amendment rights of any other student at any other time or place during the year 1967. In fact, it will suffice to refer only to the testimony of J. I. Turner (T-903-906), Dean of Men, who has been with the college since 1946, and the testimony of Richard A. Brown (T-1077-1079), Dean of Faculty, who has been with the college since 1952, for sufficient answer to this charge. In the circumstances of this case, I feel fully warranted in giving to the testimony of these widely known and highly respected Negro educators significant weight on this issue.

■ In conclusion, it should be observed that after listening to 5 days of testimony, examining 55 exhibits and reviewing an 1126-page transcript of the evidence, one thing stands out rather clearly and that is that we are not really confronted here with lack of integration nor discrimination between races nor denial of legitimate rights to freedom of speech and peaceful assembly, but rather with a conflict between certain students, white and Negro, on the one hand, and the college administrators, white and Negro, on the other, for supremacy in the field of school policy and school administration. In essence, this is the real issue in this case, and on this issue the welfare of other students, of the institution itself and of society generally, dictates that the truculent students must not prevail.