Michael D. LOWERY et al., Plaintiffs,

v.

E. G. ADAMS et al., Defendants.

Civ. A. No. 2244.

United States District Court,
W. D. Kentucky,
Paducah Division.

May 2, 1972.

William H. Allison, Jr., Ellen Mosen James, Louisville, Ky., for plaintiffs.

James O. Overby, Donald A. Jones, Murray, Ky., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Preliminary Statement

ALLEN, District Judge.

This action praying for declaratory and injunctive relief was brought pursuant to Title 28 U.S.C. § 1331(a), § 1343 (3), (4), Title 42 U.S.C. § 1983, and 28 U.S.C. § 2201 and § 2202.

The Court, after issuing a temporary restraining order on the date of filing of the complaint restoring pendente lite the four male plaintiffs to their previous rights and privileges as students at Murray State University (hereinafter referred to as Murray) heard the case on its merits on March 2 and 3, 1972.

Basically, the lengthy pleadings state that the four male plaintiffs received the following penalties: Mapp—expulsion; Lowery—indefinite suspension with the right to reapply in the spring of 1973; Parker—suspension with the right to apply for readmission in the fall of 1972, and Van Leer—social probation. It is alleged that as a result of the plaintiffs attempting to exercise their First Amendment rights on November 6, 1971, these disciplinary penalties were imposed upon them by the Faculty Disciplinary Committee and the individual members thereof and the Board of Regents and the individual members thereof in violation of the plaintiffs' rights under the First and Fourteenth Amendments. It should be added that it was alleged that the Fifth and Sixth Amendments were violated but no proof was introduced relative thereto.

The prayer of the complaint asks that the Court declare the acts of the defendants to be illegal and unconstitutional and that the regulations promulgated by the defendants be set aside as being overbroad and vague and that the Court declare that the proceedings by which plaintiffs were disciplined are in violation of the Fourteenth Amendment and that the defendants be permanently restrained, as well as temporarily, from executing the penalties imposed upon the plaintiffs, as well as restraining them from preventing a peaceful and legal protest at Murray against racial discrimination.

Defendants in their answer deny all of the allegations of the plaintiffs as to any violations of constitutional rights, admit that all of the members of their disciplinary boards are white and male, admit that the penalties administered to the plaintiffs are as alleged in the complaint and admit the lawful organization of the Black Student Union.

A very minor issue was raised on the hearing date as to whether or not Murray should have made available to plaintiff Lowery a National Defense Loan commitment which ordinarily would have amounted to $500 but as to which plain-

tiffs contend there should have been made available to Lowery a portion thereof. That issue has already been ruled on in favor of Lowery and an Order entered.

## FINDINGS OF FACT

Plaintiff, Black Student Union (hereinafter referred to as BSU), is an organization consisting as of November 6, 1971, of over 108 members whose purposes are to promote the cultural well being of black students at Murray and their sense of unity and pride in black history and black affairs and to assist in the black community of the town of Murray with community affairs.

Plaintiff Lowery is a Junior and President of BSU.

Plaintiff Mapp is on the Board of Control of BSU and a student at Murray.

Plaintiff Parker is Vice President of BSU and a Junior at Murray.

Plaintiff Van Leer is a Junior at Murray and a member of BSU.

Plaintiff Dorothy Crawford is a member of BSU and is its Assistant Public Relations Director.

On November 3, 1971, BSU held a meeting of their Board of Control at which time they decided to hold a general meeting of the entire organization to decide whether they should attend the smorgasbord-banquet to be held on November 6, 1971, in the ballroom of the Student Union Building. On the next night the general meeting was held, and it was decided to go to that Banquet since there would be many alumni attending it who constituted an influential body and a valuable adjunct to the University. It was felt that the black students should present their grievances at that time concerning alleged racial discrimination and that they would go in an orderly fashion. Mapp was chosen as their spokesman. Two faculty members, Sgt. Morehead and Curly Young, representing the University, were present at the meeting of BSU and expressed no opposition to the plan of expressing grievances provided they were expressed peaceably.

The duty of preparing for the smorgasbord-banquet and of taking tickets was assigned to Mancil Vinson, Director of Alumni Affairs. Mr. Vinson is paid by the University for his services as Director of Alumni Affairs. He testified that he and other members of the Alumni Association worked very closely with the University and that the University made no charge to the Association for the use of the banquet hall but did charge for its costs in connection with the food which was served to the Alumni, the administrators of the University, the faculty of the University, and members of the University who were present at the banquet. In this connection, it might be noted that the proof is equivocal as to the presence of any paying students at the banquet, the witnesses indicating that they did not know of any being present but that they were invited to come to it.

On November 6, 1971, some 18 to 20 members of BSU, including the five individual plaintiffs, entered the ballroom where the smorgasbord-banquet was being held. Plaintiff Van Leer was carrying the Black National Flag, which is red, black and green in color. The group proceeded in such a manner as not to interfere physically with the tables at which the alumni, friends and administrators of Murray were seated. However, no members of the group obtained tickets to go to the banquet nor did they make any inquiry from Alumni officials or University officials as to permission to be there during the banquet.

When the plaintiffs had reached a portion of the ballroom where President Sparks was located, he came forward to speak to plaintiff Lowery. The four male plaintiffs are not in complete accord as to what he said. Plaintiff Parker testified that Sparks said, "This is not the way to do it but go ahead and do it anyway." Plaintiff Lowery stated that Sparks said, "This is not the way to do it but if you want to do it go on but don't expect any help from me." Plaintiff Mapp merely states that Sparks gave permission to the students to speak with-

out-quoting Sparks. The students state that they construed Sparks' statement as an invitation to go ahead and speak but various officials of the University state that it could not have been understood as permission to speak.

Sparks himself testified that he said, "Mike, this is no place for this kind of demonstration. These people are not able to affect the situation of your budget which is your complaint." He then testified in his same lengthy answer to a question by his counsel, "This is not the way to do this and if you go ahead with this, you can expect no help from me." He then also stated that Michael Lowery said, "Well we are going to be heard and we are not going to leave."

Mapp thereupon attempted to get the attention of the Alumni by using the words "Hey, Hey, Hey." He states that he raised his fist in a general manner and spoke in a relatively quiet voice, whereas the defendants contend that he spoke in a very loud voice and raised his fist in a provocative manner.

Very shortly after Mapp commenced to speak, Dean Sparkman conferred with President Sparks as to whether or not the security officers should be called for assistance in removing the students. Sparks' answer was in the affirmative and the Dean thereupon requested Joe Green, a security officer at Murray, to come into the banquet hall and ask the students twice to leave peaceably. While there was some testimony from some of the black students that Green's first request was a question rather than a request and interpreted by them as merely a question, Mapp stated that he understood Green's request to leave peaceably as a request and not a question. There was testimony that Mapp responded to Green by saying "We're not going to leave and you are not going to make us." (Dr. Hogancamp). The Court finds that Mapp and the other male plaintiffs understood Green's request to leave as a request and order and not as a question.

Mapp testified that he told Green that the students had permission to be present in the ballroom and to be speaking and that he did so on each of the occasions when Green asked them to leave. Neither Mapp nor any of the other plaintiffs or members of the group attempted to reach Sparks in order to have him confirm to Green plaintiffs' version of Sparks' alleged permission.

Green twice asked the students to leave, and when they refused to leave he thereupon called upon other security officers to come into the banquet hall and twice more asked the students to leave whereupon they refused again.

Following the refusal to leave, Green instructed the security officers in these words "Take them, boys". At or shortly before this, plaintiff Mapp uttered some very obscene words which he claims were directed toward an Indian cheerleader but which from the weight of the evidence appeared to have been directed at the security officers. These words were "Mother F-----g Pigs". When the security officers began to execute their orders to remove the students, strong resistance was offered by plaintiff Mapp, and according to the security officers, he kicked and attempted to bite them. He hit one officer, Rogers, and knocked his glasses off. Proof shows that a scuffle took place between him and officer Rogers. Mapp's testimony is to the effect that excessive force was used on him and that his reactions were in response to that excessive force. It was shown by the evidence that while scuffling with the officers in the building Mapp was pinned to the floor.

Plaintiff Lowery stated that the handcuffs which were placed on him were rubbing his wrists and that he attempted to assuage the discomfort caused him by lifting them above his head and that he might possibly have hit an officer while attempting to loosen the handcuffs. There was evidence to the fact that Lowery used the word "damn" in resisting arrest and that he did in fact resist arrest.

As to plaintiff Parker, the only evidence concerning his conduct in connection with the removal process is that he

was physically escorted from the building.

With regards to plaintiff Van Leer, he was carrying the flag and contacted by a Mr. Lovett who is a former student at the University and is a financial contributor to its activities. Lovett stated that he did this in an attempt to calm Van Leer but that he felt Van Leer was hostile to his overtures. It was established that Van Leer threw the flag down after he was taken outside the building and that he requested the police and security officers to take him to the Murray Police Court, which they did.

The four male plaintiffs were taken to the Murray City Police Court and a very informal proceeding was conducted there by Judge Don Overbey, which culminated in citations issued against the four plaintiffs being dismissed. There was no evidence taken at this proceeding, the City Prosecutor was not present, and the Police Judge merely asked the students what had happened and allowed Green to respond thereto without anyone being sworn.

On November 6, 1971, the University delivered to the four male plaintiffs written notice to appear before the Faculty Disciplinary Committee on December 14, 1971. The notice contained a statement of specific charges and cited the Rules of the University and the Kentucky statutory provisions alleged to have been violated. Copies of these Rules and provisions were enclosed.

The Committee held a hearing on December 16, 1971, at the request of plaintiff's counsel who was permitted to attend, make motions, advise his clients, and make a final summation but not to participate otherwise in the proceedings. The same privileges were extended to counsel for the University. The students participated by cross-examining the University's witnesses and presenting their own witnesses. The Committee deliberated for twenty hours before arriving at a decision.

Subsequently, the plaintiffs served notice of appeal to the Board of Regents and a hearing was held by that Board de novo on January 31, 1972, and ended on the next day. Plaintiffs were allowed to be represented by counsel, the Honorable William M. Allison, Jr., who was allowed to cross-examine witnesses for the University and present testimony on behalf of the plaintiffs. He requested that the hearing be open to the public, which was done, and that one member of the Board of Regents be disqualified because he was present at the banquet, and this was done, and that the University make available two University faculty members for questioning, and this was done. He also requested that the Board be instructed as to the measure of proof which would be required to convict the plaintiffs. In this connection, Mr. Joe Whittle, an attorney who was acting as Chairman of the Board, stated he had in mind that certainly a preponderance of the evidence would be needed to convict the students, but the evidence is strong that he did not so instruct the Board.

It is undisputed that the Board did convene for three hours following the hearings and reached a unanimous verdict as to each of the four male plaintiffs. It was developed by the plaintiffs that at the Board hearing one member stated that he had a friend in the legislature who said he had never voted for a "nigger bill". It was also established that the word "nigger" was used on one other occasion by a Board member, but this occasion was merely explanatory of something that had happened at the hearings themselves, and in the opinion of this Court was not meant as a racial slur.

The Notice of Hearing, Statement of Charges and List of Witnesses which was mailed to each of the four plaintiffs and which pertained to the scheduled hearing before the Board of Regents read as follows:

"You are hereby directed to appear before the Board of Regents of Murray State University on January 21, 1972, at ten o'clock, C.S.T., in the Lobby of Wells Hall, Murray State University, Murray, Kentucky, for a

hearing on the charge of disorderly conduct committed by you on November 6, 1971, in and around the Student Union Building, located on the campus of Murray State University, Murray, Calloway County, Kentucky, in the following particulars:

1. Forcible entry into a University function, namely, the Alumni Banquet;

2. Creating a disturbance at said function;

3. Refusing to leave the Banquet upon the request of University officials;

4. Resisting University security police while being removed from the Building; and

5. Using vulgar and profane language while resisting arrest.

You are advised that the conduct above referred to is considered a violation of Literary Paragraphs 2 and 4 of the State(ment) of Policy on Freedoms, Rights, and Responsibilities, contained in Page 55, Murray State University Catalog for 1970–71—71–72, and it is further considered to be a violation of the Code of Conduct (See Literary Paragraphs 1 and 3 under Personal Conduct, Page 60 of the Murray State University Catalog for 1970–71—71–72.) A copy of the Code of Conduct and Statement of Policy on Freedoms, Rights, and Responsibilities has been heretofore supplied to you for your information.

You are further advised that the conduct above referred to is considered to be a violation of KRS 437.016 and KRS 432.445, copies of which have heretofore been supplied to you for your information.

This will be an informal hearing and you will have the right to bring your own witnesses, to ask questions of witnesses produced by the University, and to be accompanied by your parents and by your attorney.

A copy of the Guidelines for Disciplinary Proceedings before the Board of Regents is attached hereto for your information.

WITNESSES FOR THE UNIVERSITY:

| | | |
|---|---|---|
| Joe Green | Hardy Kelso | Charles Kemp |
| Joe Beard | Eugene Rogers | Hollis Roberts |
| Jack Gardner | L. Riley | Jim Johnson |
| Bob Steele | David Curtis | Dr. Harry Sparks |
| Wilson Gantt | Leroy Eldridge | Mancil Vinson |
| Dr. Thomas Hogancamp | J. Matt Sparkman | Vernon E. Shown |
| L. J. Hortin | Dr. William G. Read | Dr. Donald E. Jones |
| Billy J. Puckett | | |

Harry M. Sparks, President
Murray State University
Murray, Kentucky 42071

———◆———

January 12, 1972

Copy of the Notice of Hearing and Statement of Charges and List of Witnesses has been mailed to your attorney, Mr. Neville M. Tucker, Tucker & Schneider, Attorneys at Law, 3308 W. Broadway, Louisville, Kentucky 40211, on the 12th day of January, 1972."

When the plaintiffs requested and obtained a de novo hearing before the Board of Regents, charge number 1 as to "unauthorized" entry was changed to "forcible" entry.

The Statement of Policy on Freedoms, Rights and Responsibilities, paragraph 4, provides as follows:

"The University commits itself to the peaceful and orderly methods of the democratic processes and channels

of communication through which misunderstandings and disagreements can be solved. The University will not allow or tolerate any disruptive or disorderly conduct which interferes with the rights and opportunities of those who attend the University for the purpose for which the University exists— the right to utilize and enjoy facilities provided to obtain an education."

The letters which were sent to the male plaintiffs by the Board of Regents following the making of its decision are substantially the same. Each letter states in substance that the respective plaintiff was guilty of disorderly conduct and violated the Statement of Policy on Freedoms, Rights and Responsibilities.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action. See Title 42 U.S.C. § 1983, Title 28 U.S.C. § 1343(3), Estaban v. Central Missouri State College, 415 F.2d 1077 (8th Cir. 1969), and Jones v. State Board of Education of and for State of Tennessee, 279 F.Supp. 190 (D.C.M.D. Tenn.1968), affirmed 407 F.2d 834 (6th Cir. 1969).

2. This Court in reaching its opinion must do so de novo and does not sit as an administrative board reviewing the actions of the Faculty Disciplinary Committee and the Board of Regents. In reaching this conclusion, the Court is strongly impressed by the dissenting opinion of Judge Lay in *Estaban* and by the decisions in the cases of *Jones,* supra, and Fluker v. Alabama State Board of Education, 441 F.2d 201 (5th Cir. 1971). However, the Court in reaching its decision has the right to consider as evidence all of the proof presented before the Faculty Disciplinary Committee and the Board of Regents. See the Order entered by the Court pursuant to stipulation of the parties.

3. The contentions of the plaintiffs that the disciplinary hearings held by the Faculty Disciplinary Com-

mittee and the Board of Regents deprived them of due process are without merit. The plaintiffs had ample written notice of the charges made against them and of the names of the witnesses who did testify against them and that they had the right and were given the opportunity to have counsel present at the Board of Regents hearing to make an opening statement, cross-examine witnesses produced by the administration, and produce evidence on behalf of the students. It is true that at the original disciplinary hearing before the Faculty Disciplinary Committee such broad privileges were not accorded to counsel for plaintiffs, but neither were they accorded to counsel for the University. Even if the proceedings before these two bodies were lacking in due process in any respect, the action of this Court in granting to the plaintiffs a de novo hearing and full trial on the issues negatives any claim of lack of due process. See Barker v. Hardaway, 283 F. Supp. 228 (D.C.S.D.W.Va.1968), affirmed 399 F.2d 638 (4th Cir. 1968), cert. den. 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217 (1969); Fluker v. Alabama State Board of Education, supra; Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961).

4. We come now to the contention that the regulations of the University are so vague and overbroad that they are invalid and unconstitutional when placed in their context with the disciplining of the four male plaintiffs.

We repeat again for the convenience of the parties the exact wording used in the second sentence of Paragraph 4 of the Statement of Policy on Freedoms, Rights, and Responsibilities (hereinafter referred to as Statement of Policy). We refer specifically to that sentence since that is the sentence of the regulations under which the plaintiffs were charged and found guilty. The words of that second sentence are as follows:

"The University will not allow or tolerate any disruptive or disorderly con-

duct which interferes with the rights and opportunities of those who attend the University for the purpose for which the University exists—the right to utilize and enjoy the facilities provided to obtain an education."

The plaintiffs in their contentions about vagueness and overbreadth of these regulations rely heavily on the case of Soglin v. Kauffmann, 295 F.Supp. 978 (D.C.W.D.Wisc.1968), affirmed 418 F.2d 163 (7th Cir. 1969). In that case it was held that the university was without authority to discipline students where the applicable regulation provided that the university had the power to expel students for misconduct. With that portion of Judge Doyle's opinion I am in accord. However, Judge Doyle also held that a regulation which provided that students might support causes by lawful means which did not disrupt the operations of the university or organizations accorded the use of university facilities was overbroad. That portion of Judge Doyle's statement was not appealed.

The Court takes cognizance of the holdings of the United States District Court for the Western District of Tennessee in the case of Baxter v. Ellington, 318 F.Supp. 1079 (D.C.E.D.Tenn.1970), where the Court was composed of the Honorable Harry Phillips, Chief Judge of the United States Court of Appeals for the Sixth Circuit, and District Judges Wilson and Taylor, wherein it was held that the Tennessee statute relating to disorderly conduct was invalid as being vague and overbroad. The Court also takes notice of the decision of a Three Judge Panel sitting in the United States District Court for the Eastern District of Pennsylvania in the case of Corporation of Haverford College v. Reeher, 329 F.Supp. 1196 (D.C. E.D.Pa.1971), where a Three Judge Court composed of Circuit Judge Biggs and District Judges Lord and Ditter held Pennsylvania statutes pertaining to financial aid to students to be unconstitutionally vague and overbroad. In that case one of the statutes held to be un-

constitutional pertained to a refusal to obey a lawful regulation or order of any institution of higher education which refusal in the opinion of the institution contributed to a disruption of the activities of the institution. It can be seen that this statute is much broader than and much more subjective than the regulation of the University in the case at bar since it is predicated upon a disruption in an opinion of the school which would require only such meaning as any given institution might attach to it at any given time.

These cases which pertain to civil or criminal statutes are not applicable in the case at bar for the reasons cited by Chief Judge William E. Miller in *Jones*, supra, at page 201 and 202 of his opinion. In that case the applicable regulations were as follows:

"(1) Disrespect for University authority; (2) Any act in violation of city, county, state, or federal law; and (3) Any other infractions of standards of conduct that require severe disciplinary action. It is these three regulations which the plaintiffs attack."

Judge Miller's comments and holdings relative thereto are as follows:

"The Court is of the opinion that no constitutional right of the plaintiffs has been infringed because disciplinary action was taken against them pursuant to these three regulations. Plaintiffs have cited several cases to the effect that 'a law forbidding or requiring conduct in terms so vague that men of intelligence must necessarily guess at its meaning and differ as to its application violates due process of law.' Baggett v. Bullitt, 377 U.S. 360, 366–367, 84 S.Ct. 1316, 1320, 2 L.Ed.2d 377 (1964). The Court does not quarrel with this well established rule of law but believes that it is inapposite in this case. The plaintiffs here are not attacking a state statute. Rather, the attack is upon student regulations found in a university handbook. No case is cited to this Court in which an attack upon

a student regulation as *being* uncon-stitutionally vague has been sustained. To fulfill its function of imparting knowledge, a university must of course maintain order on its campus and ex-clude therefrom those who are detri-mental to its well being. A university has inherent general power to main-tain order and to formulate and en-force reasonable rules of student con-duct. Goldberg v. Regents of Univer-sity of California, 57 Cal.Rptr. 463 (Cal.App. 1st Dist. 1967). *University regulations for students because of the very nature of the institution and its goals and purposes, should not be test-ed by the same requirements of spec-ificity as are state statutes."* (Em-phasis ours)

While the Sixth Circuit Court of Ap-peals in affirming Chief Judge Miller's opinion did not refer specifically to his holdings on vagueness, it did compliment him for an excellently written opinion and upheld him in all respects.

In accord with Judge Miller's deci-sion are such cases as *Estaban, supra;* Buttny v. Smiley, 281 F.Supp. 280 (D.C. Colo.1968); and Goldberg v. Regents of University of California, 57 Cal.Rptr. 463. See, also, Due v. Florida A. & M. University, 233 F.Supp. 396 (D.C.N.D. Fla.1963). An examination of each of these cases will reveal that the regula-tions upheld are at least as imprecise or more so than the regulation which is under attack in the case at bar. The Court is not unaware of Professor Wright's criticism of some of the cases other than *Jones* as being too lax in not sustaining poorly drawn and improvised regulations of universities pertaining to student conduct. However, the Court must be governed by the present state of the applicable law as it exists in the Sixth Circuit, the only example of which is found in *Jones.*

The Court also takes cognizance of Professor Wright's criticism of the sec-ond portion of Judge Doyle's opinion in *Soglin* relating to disruptive conduct * and states that such a holding would ex-cuse hard core misconduct and import the

doctrine of overbreadth *to the campus,* where he does not believe that such a doctrine is needed.

Coming now to a discussion of the reg-ulation itself, the Court is much im-pressed by the comments of District Judge Talbot Smith in the case of McAl-pine v. Reese, 309 F.Supp. 136 (D.C.E.D. Mich.1970). In that case the Court had before it a city ordinance which was as follows:

"No person shall wilfully or mali-ciously make or assist in making any noise, disturbance, or improper diver-sion by which the peace, quietude or good order of any public, private, or parochial school is disturbed."

In discussing that ordinance, Judge Smith made the following comments which seem pertinent here:

"The plaintiffs argue that the words 'disturbance' and 'improper diversion' are unclear. Cases are cited criticiz-ing such words as 'breach of the peace,' 'good order,' 'peace,' and simi-lar terms. But of this kind of seman-ticism there can be no end. No word has an intrinsic content. It gets meaning and contour from its context, from its association, and from its com-monly understood usage. The thought expressed in the term 'fast horse' is not the same as that in the term 'fast woman' despite the similarity in termi-nology. * * * The vagueness la-bel is properly applicable only to a statute or ordinance the terms of which are such that one of common in-telligence must be in doubt both as to its meaning and its application."

Applying the principles set out by Judge Smith in *McAlpine,* the Court finds that the words "disorderly con-duct" and "disruptive" are not used in a vacuum but are used in connection with interference with the rights of those who attend the University and more specifically with their rights to utilize and enjoy the facilities provided to obtain an education. There is, there-fore, a qualifying objective with regards to the disruptive or disorderly conduct

---

* "Constitution on the Campus," by Charles Allen Wright, 22 Vanderbilt Law Review No. 5, p. 1027, October, 1969.

which is referred to in the first part of the sentence.

In the light of the broad scope which the majority of courts have given to the universities in the formulation of standards of conduct for their students and in light of the holding of Judge Miller in *Jones* and the affirmance of that case by the Sixth Circuit Court of Appeals, the Court is of the opinion that the regulation, and particularly the last sentence thereof taken as a whole, is not such that a person of common intelligence is in doubt both as to its meaning and its application. While the language used could be more precise, it is the opinion of this Court that it is sufficient to convey a definite warning as to the proscribed conduct when measured by common understanding and practices.

Coming now to the specific charges made against the plaintiffs and their relationship to the Statement of Policy and the Code of Conduct, we find first that each of the plaintiffs is charged with disorderly conduct on November 6, 1971, in and around the Student Union Building in five particulars. Those five particulars are as follows:

"1. Forcible entry into a University function, namely the Alumni Banquet;

2. Creating a disturbance at said function;

3. Refusing to leave the Alumni Banquet upon request of University officials;

4. Resisting University Security Police while being removed from the building; and

5. Using vulgar and profane language at said time and place."

Plaintiffs were advised that this conduct constituted a violation of the paragraphs of the Statement of Policy and the Code of Conduct which we have previously discussed. In addition, at the Board of Regents hearing for the first time the charge was made that the disorderly conduct was in violation of KRS 437.016 and KRS 432.445.

However, the decision of the Board of Regents states as to each of the plaintiffs that they were guilty of disorderly conduct and the violation of the letter and intent of the Statement of Policy. It is the conclusion of this Court, therefore, that the alleged violation of the two statutes has no relevance, and further that any alleged violation of the Code of Conduct was not an issue before this Court since the Board of Regents did not rely upon it in their statements of suspension and expulsion.

Coming back to the specific charges, the Court finds that as to charge number 1, plaintiffs did not commit a violation of that charge in its technical sense. Forcible entry implies the use of physical force with which to gain entry into a building. Here the students walked through the doors of the banquet hall without encountering physical resistance on the part of the University and Alumni officials. The officials were so startled by the entry of the plaintiffs into the building that their first actions with regard to the entry were namely to make an inquiry as to why they were there. While this inquiry was answered in a rude manner by an unidentified student, no physical force was exerted by the students to gain their entry into the building. It is true, of course, that they had not secured tickets to attend the banquet, and it follows that actually they were trespassers in the building but not persons who entered forcibly therein.

The next charge is the creation of a disturbance at the Alumni banquet. The word "disturbance" is said in Webster's International Dictionary to mean:

"1. An interruption of a state of peace or quiet, or of a regular procedure; as, a disturbance of religious exercises.

2. Confusion of the mind; agitation of the feelings.

3. Violent agitation in the body politic, public commotion.

4. Law. The hindering or disquieting of a person in the lawful and peace-

able enjoyment of his right; the interruption of a right; as, the disturbance of franchise, common, ways, tenure, or patronage.

Syn.—Brawl, turmoil, uproar, hubbub, derangement, confusion, agitation, perturbation, annoyance."

In this connection the Court takes cognizance of the conflicting testimony of the witnesses. Plaintiff Mapp testified that President Sparks gave permission to him to speak and for the group to be present at the banquet. In his testimony Mapp does not directly quote the President. Mapp goes on to testify that he thought Green on each occasion when Green asked him and other members of the group to leave knew that they had permission from Sparks to speak and to be there. None of the plaintiffs, however, made an effort to reach Sparks after Green came into the banquet hall so that Green could be apprised directly of Sparks' intentions.

The testimony of the defendants' witnesses is to the effect that plaintiffs were told to leave by Green and that they explicitly refused to leave. Mapp himself stated that he understood Green's request as a request to leave.

In passing the Court takes cognizance of the fact that the words "creating a disturbance" are in themselves quite vague and have been held in the construction of criminal statutes to be so vague and indefinite that they render those statutes unconstitutional. See Landry v. Daley, 280 F.Supp. 929 (D.C. N.D.Ill.1968).

The question as to whether or not there was a disturbance created by one or more of the plaintiffs seems at first blush to be somewhat perplexing. Their intentions apparently were peaceful when they first came to the banquet hall. No threats were made and no weapons were carried. The creation of the disturbance might be said to have had its beginning when Mr. Green entered the hall and when plaintiff Mapp uttered the obscene words which he did toward Mr. Green. It is well recognized in the law,

as held in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), that there are various fighting words not protected by the First Amendment because they inflict injury by their very utterance. The Court considers plaintiff Mapp's words to be in that category and holds that they created a disturbance since they amount, in the language of Chaplinsky, to a verbal assault.

With reference to the other three plaintiffs, the question is closer. They did not create a disturbance when they came into the ballroom. However, as reasonable men they were bound to contemplate the normal consequences of their actions. When they took the position that they would not leave the banquet hall despite the orders of Mr. Green, they then knew that some force would have to be used to evict them. Knowing that force would be used to evict them, it can be said with some degree of certainty that they knew a disturbance would be created by the use of this force and their reactions thereto.

■ With reference to charge number 3 which pertains to refusal to leave the banquet hall, Dr. Sparks testified that Lowery said immediately after Sparks made his last quoted comments, "We are going to be heard and we are not going to leave." Mapp's testimony was to the effect that he told Green that he had permission from Sparks to be there. However, he stated in substance that it was clear in his mind that he was being requested to leave by Green, and it is apparent from the Court's previous recitation of the testimony that he refused to leave, as did the other plaintiffs.

■ With reference to charge number 4 which pertains to the resistance to security police while being removed from the building, it is apparent that plaintiffs Mapp and Lowery resisted and that plaintiffs Van Leer and Parker did not. It is also apparent that plaintiff Mapp was by far the greatest resister, and that plaintiff Lowery's resistance was based to a large extent on his feeling that the handcuffs were unduly restrictive. There was substantial evidence to con-

clude that both he and Mapp were resisting the security police.

█ With response to charge number 5, the use of vulgar and profane language while resisting arrest, it is obvious that plaintiff Mapp, in using the obscene language that he did which was directed toward the security officers, falls within the purview of charge number 5. After the evicting procedure had begun, he admits to the use of other language which is profane, although relatively mild by the loose standards of our day, to-wit: the word "damn". With reference to plaintiff Lowery, the word "damn" was attributed to him while resisting arrest. No such profanity is shown on the part of Parker or Van Leer while resisting arrest, although Van Leer did use it while inviting arrest.

█ The question arises as to whether or not plaintiffs must be proven guilty of all of the charges made against them or just one, and also as to what standard of proof is necessary. In the opinion of the Court, it is sufficient for the University to show a violation of at least one of the charges as to each of the four male plaintiffs. As to the standard of proof required, Judge Miller, in *Jones*, held that the standard was that of substantial evidence and not that of a preponderance of evidence. The majority opinion in *Estaban* supports this view, and the District Judges for the Western District of Missouri do likewise in their standards which they have set out in 45 F.R.D. 134–148. Circuit Judge Lay in *Estaban* held that a Federal District Court does not have jurisdiction under the Civil Rights Act to review student discipline by school officials. 415 F.2d 1090. He states that the District Court's mission is to make findings of fact and conclusions of law as to whether in fact or in law state action has denied to a plaintiff any federal right. While Judge Lay's opinion is very persuasive, it suffices to say that this Court believes that there was both a preponderance of the evidence and substantial evidence upon which to base a finding that the male plaintiffs had been guilty of at least one

of each of the charges brought against them.

█ The Court, in reaching the decision that a smorgasbord-banquet is an educational function of the University despite the fact that there was no program offered there, relies heavily upon the case of Powe v. Miles, 407 F.2d 73 (2nd Cir. 1968). There the university was holding an annual Parents Day. One of the functions scheduled for the Parents Day was a military review to be held on the football field. Several students of the university decided to demonstrate during the ceremonies and did not give a forty-eight hour notice to the Dean of Students required by the policy on demonstrations.

The sixteen students who planned the demonstration did in fact come to the football field and walked on it in front of the reviewing stand between the stand and the cadets assembled on the field. Shouts were exchanged between the demonstrators and spectators, but no physical violence took place. Five minutes after the students had entered the field, the Dean announced to them that their actions were in violation of the demonstration guidelines and requested them to conform by removing themselves from the field. Eight of them complied but eight did not. Several requests were made of these eight but they refused to comply and constructed a direct obstacle to the vision of those in the reviewing stand and in the lower tiers of the grandstand. They also presented an obstruction to the presentation of awards. The Court held that the demonstration of the plaintiffs was in violation of guidelines 5 and 6 of the policy on demonstrations.

Paragraph 5 provided that demonstrations must not attempt to force the cancellation of an event sponsored by a university official or by a faculty or student group. Paragraph 6 provided that care must be taken to avoid disrupting classes or other educational activities. In reaching this decision the Court, in essence, held that the Parents Day military program was in effect an educational activity and a university sponsored event.

As Professor Wright states on Pages 1040 and 1041 of his article, a university is not obligated to tolerate interference with any lawful mission, process or function of the institution or, stated in a different manner, the normal activities of the university are protected. He further states that activities, to the extent that they are protected by the First Amendment, must be permitted, but they need not be permitted at a time or place that will interfere with the normal activities. See, also, 45 F.R.D. 145.

In the complaint plaintiffs have attempted to make this case a class action pursuant to Rule 23 Federal Rules of Civil Procedure. It is obvious from the previous portion of this opinion that the main focus of this action is upon the alleged wrongful disciplinary action meted out to the four male plaintiffs. None of the other persons alleged to be a class is concerned with the adjudication as to these four male plaintiffs and, therefore, common questions of law or fact with the members of the purported class is not present here. See Brooks v. Briley, 274 F.Supp. 538 (D.C.M.D.Tenn. 1967) and *Jones,* supra.

Paragraph 47 of the complaint states in substance that the disciplinary proceedings, if not declared illegal by the Court, will have the effect of, and will have been brought for the purpose of, deterring, intimidating, hindering and chilling the plaintiffs, the class they represent, and other university students from engaging in the exercise of constitutionally protected rights. The disciplinary proceeding, as has been stated before, was brought only against the four male plaintiffs and, therefore, the prerequisites for a class action do not exist.

The Court has been asked also to declare various portions of the Statement of Policy and Code of Conduct unconstitutional. The Court has already ruled that Paragraph 4 of the Statement of Policy is not unconstitutional and invalid and that this is the only section of the various rules and regulations of the University which affect the rights of the four male plaintiffs.

In the case at bar there is no present threat of any specific act as to which this Court can make an adjudication as to other portions of the Statement of Policy and the Code of Conduct. A mere intention on the part of the administration to take some action at some future time, which if it does occur might constitute a cause of action under the Civil Rights Statutes, does not present a justiciable question. Fowler v. United States, 258 F.Supp. 638 (D.C.C.D.Cal., 1966); Hatter v. Los Angeles City High School District, 310 F.Supp. 1309 (D.C.C.D.Cal., 1970); Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952).

In reaching the decision that the Court should not rule upon the validity of the regulations called into question by plaintiffs, the Court is governed by the general principles that Federal Courts will not decide any constitutional question in advance of the necessity for its decision. See Thorp v. Housing Authority of City of Durham, 393 U.S. 268, 89 S. Ct. 518, 21 L.Ed.2d 474 (1969).